Fortunat J. MICHAUD, Petitioner,
Appellant,

v.

Allan L. ROBBINS, Warden, Maine State Prison, et al., Respondents, Appellees.

No. 7468.

United States Court of Appeals,
First Circuit.

Heard March 3, 1970.

Decided April 22, 1970.

Pierce B. Hasler, Portland, Me., with whom Donald F. Fontaine, Portland, Me., and R. John Wuesthoff, Saco, Me., were on brief, for petitioner, appellant.

John W. Benoit, Jr., Deputy Atty. Gen., for respondents, appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Petitioner's appeal from the district court's denial of his petition for habeas corpus relief—263 F.Supp. 535 (D.Me. 1967)—challenges the voluntariness of a confession given by petitioner which contributed to his conviction for the murder of an eleven year old girl.[1]

The murder, confession and trial having occurred in 1955, the state is not held to the standards of conduct laid down in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Johnson v. New Jersey, 384 U.S. 719, 721, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Our question is whether the confession in question was the result of an overbearing of petitioner's will by the police authorities, a judgment to be made only after a thorough examination of the record. Davis v. North Carolina, 384 U.S. 737, 739, 741–742, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

The facts have been clearly, thoroughly, and accurately set forth in the opinions of the district court and the Supreme Judicial Court of Maine. We need only sketch the background concerning the contested confession. The Saco, Maine police, in search of a missing young girl, pursued a tip which led an officer to petitioner's house around 9:00 p. m. in late August 1955. Petitioner, at that time a boy of fifteen with a near normal intelligence but a mental age of only twelve, was still in the seventh grade, could not read, write or tell time, and had few friends. He had lived with foster parents since age two, though his real parents were still living, in a distant locality. Because petitioner admitted having been with the missing girl earlier that day, the policeman asked the foster mother if he could take petitioner to the police station to continue the investigation; she assented. The police having no substantial reason at this point to suspect that petitioner was responsible for the girl's disappearance, no arrest was made or warnings given.

Pursuing the only information they had, two policemen questioned petitioner

1. The state insists that the only question before us is the one first raised by petitioner in state court: whether there was a written promise of leniency by police which induced petitioner to confess. However, as the opinions of the Supreme Judicial Court of Maine—161 Me. 517, 215 A.2d 87 (1965)—and the federal district court make clear, neither confined itself to that narrow question, both addressing the question of voluntariness in light of all the facts. *See also* United States ex rel. Kemp v. Pate, 359 F.2d 749 (7th Cir. 1966).

from about 9:30 p. m. until about midnight concerning what he and the girl had done together that day and when he had last seen her. Petitioner said that they had departed when he went up over some railroad tracks and the girl turned away and went home. At around midnight, petitioner inadvertently gave a different account of when he had last seen the girl, suggesting to the policemen that the girl had walked up the tracks with him. When confronted with this, petitioner, by nodding his head to a question, admitted that the girl was still up there. Petitioner claimed that he then offered to lead the police to the scene in return for a promise of leniency and that he received such a promise in writing. This was denied by the police and his trial attorney. At this point, petitioner led the police to the place in the woods near the railroad tracks where he had left the girl. Here they found her. A local doctor who accompanied them ascertained that she was dead. The three men and petitioner returned to the police station to call the Maine State Police and others. Petitioner remained in the police chief's office with one of the policemen.

At around 4:00 a. m., a State Police officer, after warning petitioner that his statements could be used against him, engaged petitioner in conversation. Petitioner told the story of his going into the woods with the girl, striking her, and dragging her a considerable distance to the spot where he had led the police. At 6:00 a. m., after further warnings, a statement was reduced to writing by a deputy sheriff and signed by petitioner. That morning counsel was appointed for petitioner and he was arraigned. A few days later, he was sent to the Augusta State Hospital for determination of his sanity and mental capacity and told his story in detail to the psychiatric staff.

There were, in effect, five confessions admitted at the trial: the nodding admission that the girl was still in the woods by the railroad tracks; his leading the police to the girl's body; the 4:00 a. m. oral statement; the 6:00 a. m. written statement; and the narration of the crime at the State Hospital. Petitioner has explicitly confined his attack in this appeal to the voluntariness of the first two confessions, which he has treated as one. Moreover, since none of the other three confessions were objected to during the state habeas proceeding in 1964, 28 U.S.C. § 2254 precludes us from considering their constitutional validity.[2]

In applying such cases as Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), and Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), to the circumstances before us, we are mindful of a significant difference in starting points. Without exception, the cases cited by petitioner on the involuntariness of confessions of young men have as their starting point the known commission of a crime, followed by the taking into custody and the extensive grilling of the suspect by the police.[3] In this case the starting point is the report of a missing person, followed by the custody and interrogation of petitioner, not to ascertain his connection

2. After oral argument, it was brought to our attention that petitioner's objection to the fifth confession—obtained in the State Hospital—was rejected by the Supreme Judicial Court of Maine on March 11, 1970. However, although petitioner may now have exhausted his state remedies with regard to that confession, the claim must first be raised in the federal district court before we can consider it.

3. In addition to *Haley* and *Gallegos*, petitioner directs our attention to In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1966); In Matter of Gregory W. and Gerald S., 19 N.Y.2d 55, 277 N. Y.S.2d 675, 224 N.E.2d 102 (1966); In Interests of Carlo and Stasilowicz, 48 N.J. 224, 225 A.2d 110 (1966); United States v. Morales, 233 F.Supp. 160 (D. Mont.1964); Gilbert v. Beto, 274 F. Supp. 847 (S.D.Tex.1967). Not only did all of these cases involve the apprehension of a youth as a suspected perpetrator of a known crime, but each revealed a pattern of conduct by the police markedly more oppressive than that presented here. We see no purpose served in setting forth point-by-point comparisons.

with a crime or elicit a confession but to learn of facts which might help in the search. Since the petitioner was their only lead, the police were entitled to glean from him anything which might aid in their search, and their request to his foster mother that they talk with petitioner at some length at the station does not seem unreasonable in these circumstances.[4]

■ The threshold for our search for impermissible tactics resulting in an overbearing of petitioner's will is some time after his arrival at the police station. The total time which elapsed before petitioner agreed to lead the police to the girl was about two and a half hours. Although petitioner, represented by able counsel, testified at some length at the state habeas corpus hearing to the events of those hours, the only reference to what happened prior to the very end of the period were three statements: that petitioner was asked to tell what had happened, that he was told he could not leave until he did so, and that at some point he was asked if he had harmed or killed the girl. There was no intimation by petitioner that during the preconfession period he was uncomfortable, fatigued, in fear, or unpleasantly treated. Only two local police officers were present, and there is no suggestion that their questioning was hostile, organized, without respite, or in relays. If, after nine years of reflection, petitioner has nothing more to say about the events of the evening than what we have just reported, we are inclined to believe that there is nothing more which could be said.

The picture which emerges from petitioner's testimony, corroborated by the police, is that for some time after 9:30 p. m. the questioning was directed simply at trying to find out what petitioner knew about the missing girl. Although petitioner did not further indicate the nature of the questions, we infer that the police asked where they had been, when and where he had last seen her, and undoubtedly where he thought she might subsequently have gone. At some point the police apparently were unsatisfied that petitioner was telling all he knew. There was yet a genuine possibility that what was unrevealed may have involved matters falling short of a crime. As time proceeded, however, it appears that the police sensed that something was indeed wrong and that petitioner was responsible for the girl's disappearance. At this point the police should have advised petitioner of his right to counsel and to remain silent, and the absence of such warnings is significant. Davis v. North Carolina, *supra*, 384 U.S. at 740, 86 S.Ct. 1761.

■ The critical part of this 2½ hour period was near midnight when petitioner retold his story with a significant detail differing from his prior versions.[5] When petitioner mentioned that he and the girl walked up the railroad tracks together, a policeman immediately asked, "She's still up there, isn't she?", to which petitioner nodded assent. This to us seems a critical admission, for the police now knew that petitioner and the girl had gone to an area which if necessary could be searched;[6] that she was so incapacitated that, many hours later,

---

4. While the police may not have obtained "permission" from the foster mother in the sense of a fully informed choice after the advice of counsel, the police conduct here was a far cry from the police actions in In re Gault, *supra*, 387 U.S. at 5, 87 S.Ct. 1428.

5. While petitioner was young, a non-learner in school, and retarded in his verbal skills, his general intelligence was within a normal range. His persistence in adhering so long to the version he had decided to tell is the most direct evidence

that, in whatever other respects his mental development was deficient, he was not "highly suggestive". *Cf.* Fikes v. Alabama, 352 U.S. 191, 193, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

6. One of the officers, testifying as to the state of their information at this point, said: "So * * * we've already established that—that the body was in that area. We didn't pinpoint it down as to exactly where it was. But we knew it was up off the railroad tracks."

petitioner could think she was still there; and that there was no reason to suspect that anyone else was involved.

While warnings should have been given before this admission, we cannot say that this 1955 performance by the police —given their starting point of trying to locate a missing person—was so impermissible, or that giving a slightly different version of the day's events was such proof of a will overborne, as to constitute a denial of due process. This is far removed from the five hour post-midnight, post-arrest grilling by five officers in relays in *Haley, supra,* culminating in the showing to the prisoner of the alleged confessions of his two friends, and from the five day post-arrest detention of the boy in *Gallegos, supra.*

■ Two questions remain. After the nodding admission which we have just discussed, petitioner testified that he told the officers that if they promised in writing to "talk to the judge, and get me sent to the State's School or something like that * * * I'll tell you where she is." Petitioner further testified that he received such a written promise, gave it to the sheriff the next day for delivery to the judge, and never heard about it again. This claim was belated, uncorroborated, and contradicted by both the police and his own former attorney. Moreover, petitioner's bargaining power for such a promise at this point was little; all he was offering was to save some time in locating the girl, whose general whereabouts was already known. We agree with the findings of the state habeas court, the state Supreme Judicial Court, and the district court that petitioner's testimony must be rejected.

■ All that the state habeas proceeding credibly revealed on the issue of police inducement to confess was the volunteered testimony of an officer that petitioner had asked "What will happen to me" and that the officer had replied, "I don't really know. I know that you

are a minor. I don't know if they'll send you to the State School for Boys, or where they'll send you. It'll be up to the courts to decide." [7] Petitioner uses this testimony to argue repeatedly that this induced his confession, conveying the impression that it was this that led to the first break in the case. But as we have noted, and as the very question which elicited the officer's response ("What will happen to me?") implies, there had already been the critical nodding admission. We cannot believe that a speculative statement with no hint of either prediction or promise, could have been a factor in inducing petitioner to take the officers to the body. The natural explanation is that, having admitted that the girl was "still up there", petitioner saw nothing to gain by prolonging her discovery. If, as we have held, the nodding admission was voluntary, the act of leading the officers to the scene did not become involuntary because of the statement of the officer.

Finally, we must consider, as in *Haley,* whether what happened after discovery of the body reflected such a callous attitude by the police as to justify our discounting what the record shows as to the 2½ hour period of interrogation. This case differs in at least two respects from *Haley.* In the first place, there is, except as to the written promise, no dispute between petitioner and the police as to what happened. Our view of the first period of interrogation is not based on police "apologia", 332 U.S. at 600. In the second place, unlike the three day incommunicado period in *Haley,* what happened from 2:00 to 6:00 a. m. did not reflect such a deliberate insensitivity to petitioner as to make what had happened earlier "darkly suspicious". 332 U.S. at 600, 68 S.Ct. 302, 92 L.Ed. 224.

■ What limited questioning did take place after petitioner returned from the woods was preceded by warnings as to petitioner's rights. While we are of

7. The fact that this was unresponsive to the question asked and was volunteered —i. e., that it need not have come up at all—suggests that it was not a diluted version of a stronger statement.

the opinion that such pre-dawn confessions by youngsters after a full night of police custody are almost inherently involuntary, *see Haley, supra,* we do not believe that their occurrence in 1955 reflects a callous police attitude, at least when conducted in the manner evidenced here. Moreover, counsel was appointed for petitioner early that morning and was immediately allowed to speak with him; at no time were either his foster parents or his counsel denied access to him. We therefore have no reason to infer coercive conduct on the part of the policemen prior to the midnight confession.

Although we recognize this to be a close case, we agree with the district court that the police did not overbear petitioner's will at the time that the two confessions in question were given. Accordingly, it was not a denial of due process to admit them.

Affirmed.