James LeRoy **IVERSON**, Petitioner,

v.

**STATE OF NORTH DAKOTA,**
Respondent.

Civ. No. 4694.

United States District Court,
D. North Dakota,
Northeastern Division.

Aug. 31, 1972.

John G. Shaft, of Shaft, Shaft, McConn & Fisher, Grand Forks, N. D., for petitioner.

Robert A. Alphson, Special Counsel, and Thomas B. Jelliff, State's Atty., Grand Forks, N. D., for respondent.

## MEMORANDUM AND ORDER

RONALD N. DAVIES, District Judge.

The petitioner, James LeRoy Iverson, was tried to a jury in Grand Forks County District Court, State of North Dakota, upon charges of murder involving two young women, Diane Bill and Carol Mayers. He was found guilty of murder in the first degree in connection with the death of Miss Bill and of murder in the second degree of Miss Mayers. On May 9, 1969, the State District Judge imposed a life sentence on Iverson

on the first degree murder conviction and an indeterminate sentence of 25 to 30 years on the second degree murder conviction.

In due course Iverson's counsel moved for a new trial in the District Court, which motion was denied and there followed an appeal to the Supreme Court of . North Dakota which affirmed both the judgment of conviction and the trial court's order denying petitioner a new trial. State v. Iverson, N.D., 187 N.W. 2d 1.

Having exhausted his state remedies Iverson filed a petition for a writ of habeas corpus in this Court on February 23, 1972, and thereafter with Iverson present a hearing was had thereon in this Court on May 25, 1972. Thereafter counsel for petitioner and for the State of North Dakota were given further opportunities to submit briefs in support of their respective positions, after which on July 7, 1972, the matter was finally submitted to this Court. Iverson's trial counsel did not represent him on the appeal prosecuted in the Supreme Court of North Dakota, nor does he represent Iverson here. This Court appointed John G. Shaft, Esq., Grand Forks, North Dakota, to represent him in this habeas corpus proceeding.

Iverson assigns the following grounds as bases for his contention that he is unlawfully held in custody:

(a) The convictions resulted from the admission of evidence obtained as the result of statements secured from the petitioner by compelling him to be a witness against himself at the State's Attorney's Inquiry, contrary to Amendment V, Constitution of the United States.

(b) That during the trial of the case the state introduced evidence which was obtained in a search of the petitioner's place of residence and that this search was an unreasonable search as prohibited by Amendment IV, Constitution of the United States.

(c) That the mental condition of the petitioner at the time of the preliminary hearing caused him to be denied due process, consistent with Amendment XIV, Constitution of the United States.

(d) The petitioner was denied assistance of competent counsel for his defense, consistent with Amendment VI, Constitution of the United States.

(e) The opinion of the Supreme Court, State of North Dakota, is itself a prima facie and overt denial of due process as guaranteed by Amendment XIV, Constitution of the United States, in that it was an obvious attempt to determine guilt rather than the legal sufficiency of the trial.

The facts necessary to an understanding of this case and for disposition of Iverson's petition are summarized here:

Around 10:30 a. m., Wesnesday, November 27, 1968, in the City of Grand Forks, North Dakota, the bodies of two young women, Carol Mayers and Diane Bill, were discovered in Carol's apartment by Diane Bill's parents who had been informed by Diane's employer that neither girl had shown up for work for the second consecutive morning. An autopsy performed later the same day disclosed that both girls had died from traumatic asphyxiation with findings compatible with manual strangulation.

Both the Grand Forks Police Department and the Grand Forks County State's Attorney's office commenced simultaneous investigations which continued throughout the day the bodies were discovered and on the same day the State's Attorney's office conducted an inquiry into the two deaths. As part of the investigation of Carol Mayer's apartment a bloodhound was used. A pillowcase found there was employed to give the dog a scent. The bloodhound lost the trail in an alley outside the girls' apartment building. Sometime after the bloodhound lost the scent both

the pillowcase and the dog were brought to the Police Station in Grand Forks about the time when Iverson may just have been finishing testifying at the State's Attorney's Inquiry.[1] The bloodhound having again been given a scent from the pillowcase followed a trail leading to Iverson who was alone in a room at Police Headquarters with State's Attorney John A. Alphson and City Detectives Orvis Olson and Robert Siverson, together with Court Reporter Ralph D. Krasky. Iverson was allowed to leave Police Headquarters after the inquiry, but that same night was taken into custody by the State's Attorney and his Administrative Assistant, one Leo Novacek, at about 8:00 p. m. in a local bowling alley.

## THE PETITIONER'S ARGUMENT

(a) *The convictions resulted from the admission of evidence obtained as the result of statements secured from the petitioner by compelling him to be a witness against himself at the State's Attorney's Inquiry, contrary to Amendment V, Constitution of the United States.*

Because counsel in briefs and arguments[2] have frequently obscured the gut issues involved in this matter, this Court addresses itself directly to those points. The State's Attorney's Inquiry was begun in this fashion:

"PRESENT: Orvis Olson, Robert Siverson and Ralph Krasky.

"By Mr. Alphson:

Q Give us your name and address?

A James Iverson, 515 First Avenue South.

Q Now, this is a states attorney's inquiry as to the death of Carol Mayers and Dianne Patricia Bill. *I must advise you that you can not refuse to answer the questions.* Once the statement has been completed here and transcribed, you will be required to sign that this is your testimony. I must advise you that you have a right to have an attorney present during these questions if you so desire. What is your wish? I can tell you that the matter of the inquiry is the fact of a double murder or at least of a homicide of one nature.

A Okay.

Q Okay what?

A Well, you said—proceed. The statement is all right with me.

Q All right.

A *I don't understand it.*

---

1. It is noteworthy that State's Attorney John A. Alphson did not conduct the State's Attorney's Inquiry in accordance with North Dakota law. Witnesses at such an Inquiry are to ". . . be sworn by the state's attorney to testify under oath, and to make true answers to all questions which may be propounded to him *by such state's attorney* . . . ." (Emphasis added.) During the Inquiry the State's Attorney retired therefrom and asked the two detectives to continue the interrogation of Iverson, which both Detectives Orvis Olson and Robert Siverson did. There exists no statutory authority for their questioning of Iverson. Section 11–19A–09, North Dakota Century Code. Indeed, one of the reasons for a hiatus in the Inquiry is Detective Siverson's talking "off the record."

2. By way of illustration, counsel for the State of North Dakota argued at the hearing before this Court on May 25, 1972, that the late Mr. Justice Felix Frankfurter had said in United State v. Monia, 317 U.S. 424 at 427, 63 S.Ct. 409, 87 L.Ed. 376: "The right to refuse to answer is so well known that it appears in comic strips and everybody should and has to know that right." The State's lawyer also referred to *Monia* as a fire marshal's inquiry. *Monia* was *not* a fire marshal's inquiry; it had to do with a violation of the Sherman Act. Nowhere in that case is any reference made to comic strips. Moreover, in *Monia* Mr. Justice Frankfurter's opinion was one of dissent, which counsel ought properly to have advised the Court in any event.

Q All right. Mr. Iverson, now we are talking about accounting for your time from approximately 3:30 Monday." (Emphasis mine.)

It is significant that Iverson, who said, "I don't understand it," was found by an examining psychiatrist and senior psychologist on December 10th not competent to understand the nature of the proceedings against him.

Relying upon Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Iverson alleges these proceedings were violative of his constitutional rights since he was not given the warnings required by that case and because the State's Attorney clearly told him he could not refuse to answer. He was in fact compelled to testify against himself in violation of the Fifth Amendment to the Federal Constitution.

In affirming Iverson's conviction, the North Dakota Supreme Court said on the subject:

"The preliminary matters discussed with Iverson at the State's Attorney's Inquiry fell short of the warnings required by *Miranda*. Although Iverson alleges that he was entitled to these warnings, the real issue is whether at the time of the State's Attorney's Inquiry he had the status of a person to whom the Miranda warnings must be given. That is, at the time of the State's Attorney's Inquiry, was Iverson a witness, or was he the suspect or the focus of the investigation?" State v. Iverson, 187 N.W.2d 1, 13.

■ This Court agrees with the foregoing statement of the real issue, but not with the Supreme Court's conclusions, since it is utterly inescapable from a study of the transcripts, files and records in this case that at the time of the State's Attorney's Inquiry, the petitioner Iverson was a suspect and was the focus of the investigation. As such he was entitled to the *Miranda* warnings. He did not get them and his rights under the Fifth Amendment to the Constitution of the United States were clearly violated. To hold otherwise it would be necessary completely to ignore the testimony of Robert E. Shepler and Bruce Gustafson given before the State's Attorney prior to Iverson's being compelled to testify against himself in which they alluded to "the one legged man," "the Nodak Cab" and one "Jim" visiting the apartment of one of the girls. Additionally, as the police and the State well knew, James LeRoy Iverson did have a prior criminal record. If Iverson had not been a suspect at the time of the State's Attorney's Inquiry there is no logical or rational explanation or reason for bringing a bloodhound down to Police Headquarters, permitting the dog another sniff of the pillowcase and releasing the bloodhound to find its way into the room in which Iverson was being detained and in which there was no one else present aside from participating police officers and a court reporter. Moreover, the State has never satisfactorily answered this question: Why, if Iverson was not a suspect at this point, was he requested to take a lie detector test when no similar request was made of any other person?

Section 11-19A-09, N.D.C.C., under which the State's Attorney purported to examine Iverson without regard to his basic constitutional rights, provides:

"State's attorney may subpoena witnesses.—If the state's attorney of the county shall be notified by any officer or other persons, or be cognizant himself of any violation or criminal act causing such death, or in any manner connected therewith he may inquire into the facts of such violation or criminal act, and for such purpose he shall issue his subpoena for any person who he has reason to believe has any information or knowledge of such violation, to appear before him at a time and place designated in such subpoena, then and there to testify concerning any such violation. The subpoena shall be directed to the sheriff or any constable of the county and shall be served and returned to the state's attorney in the same manner as subpoenas are served and returned

in criminal cases. Each witness shall be sworn by the state's attorney to testify under oath, and to make true answer to all questions which may be propounded to him by such state's attorney touching any such violation or criminal act. The testimony of every witness shall be reduced to writing, and shall become a part of the coroner's files in such case. For all purposes in this section the state's attorney may:

1. Administer oaths or affirmations to all witnesses;

2. Apply to the district court for the punishment of any witness for contempt for or on account of any disobedience of a subpoena, a refusal to be sworn, or to answer as a witness, or a refusal to sign his testimony; and

3. Compel the attendance of witnesses by attachment in the manner and with the effect provided in the title Judicial Branch of Government. *Any witness compelled to testify under the provisions of this section shall be entitled to counsel and all other constitutional rights.* (Emphasis added.)

There is no manner in which the statement, "Any witness compelled to testify under the provisions of this section shall be entitled to counsel and all other constitutional rights," can be misinterpreted or misunderstood.

█ The Fourteenth Amendment to the Constitution of the United States makes it eminently clear that no State may make or enforce any law which abridges the privileges or immunities of citizens of the United States and that same amendment just as clearly states that no citizen may be deprived of life or liberty without due process of law and that no State may deny to any person the equal protection of the law. Consequently with or without *Miranda,* compelling Iverson to testify at the State's Attorney's Inquiry under the circumstances disclosed, violated his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States and his conviction cannot stand.

(b) *That during the trial of the case the state introduced evidence which was obtained in a search of the petitioner's place of residence and that this search was an unreasonable search as prohibited by Amendment IV, Constitution of the United States.*

Based upon affidavits of a police officer and the Administrative Assistant to the State's Attorney, the issuing magistrate found probable cause to issue a warrant authorizing "in the daytime or night time" the search of Iverson's automobile and residence for "ladies garments either torn or with blood stains on them, men's garments either torn or with blood stains on them, ladies purses, identification for Carol Mayers * * *." The affidavits are as follows:

"Robert Siverson, being first duly sworn on oath deposes and says:

"That he is a detective with the Grand Forks Police Department and as such, is actively investigating the murders of Carol Mayers and Dianne Patricia Bill. That during this investigation he has talked to James Iverson, who is employed in the City of Grand Forks as a driver for the Nodak Cab Company.

"That the said James Iverson has admitted that he knew Carol Mayers and has transported her to her job as a waitress at the Golden Hour Cafe on many occasions.

"That he has been in Carol Mayers' apartment on several occasions, the most recent being November 25, 1968, at approximately 6:00 o'clock a. m.

"That during this interrogation of James Iverson the said Robert Siverson noted some scratches on the back of James Iverson's neck and on his hand. Therefore your affiant prays a warrant be issued to search the said James Iverson's 1959 Chevrolet convertible, bearing Minnesota license number 7ZE629.

"That your affiant has seen the said James Iverson driving a 1959 Chevrolet convertible, light green in color with Minnesota license plates 7ZE629 in the City of Grand Forks, and that your affiant's further investigation reveals that the said James Iverson resides at 515 First Avenue South in the City of Grand Forks.

"That your affiant therefore prays that a warrant be issued to search the said James Iverson's automobile and his residence which is listed as 515 First Avenue South in the City of Grand Forks to search for women's garments and men's garments which may or may not be torn and may or may not have blood stains on them, for a women's purse or purses and for any and all identification belonging to the said Carol Mayers according to the statutes made and provided, and that the search be made either during the day time or night time."

"Leo G. Novacek, being first duly sworn on oath, deposes and says:

"That he is an administrative assistant for the States Attorney's office in and for the County of Grand Forks.

"That as such he has been involved in the investigation of murders of Carol Mayers and Dianne Patricia Bill. Pursuant to information received from Robert Siverson the following investigation was made:

"That on this date your affiant accompanied States Attorney John A. Alphson to the Uptown Bowling Alley where he observed James Iverson while he was bowling.

"That your affiant observed some scratches on the back of James Iverson's neck as well as the back of his hand. That further investigation by the said John Alphson and your affiant revealed a considerable amount of scratches above the elbow on both arms of the said James Iverson.

"That upon transporting James Iverson to the police department your affiant observed the chest as well as the back of the said James Iverson and again observed more scratches.

"That your affiant therefore prays that a warrant be issued to search the said James Iverson's automobile described in Detective Robert Siverson's affidavit as a 1959 Chevrolet convertible bearing Minnesota license plates 7ZE629, and that said James Iverson's residence listed as 515 First Avenue South in the City of Grand Forks to search for women's garments and men's garments which may or may not be torn and may or may not have blood stains on them, for a women's purse or purses and for any and all identification belonging to the said Carol Mayers according to the statutes made and provided, and that the search be made either during the day time or night time."

Execution of the warrant in the night time resulted in the seizure of a pair of trousers, a towel and a coat from Iverson's residence. These items were admitted into evidence at his trial without objection. Expert testimony at that time established that blood stains found on the trousers were of blood group type A, the blood grouping of Diane Bill, and blood group type B, the blood grouping of Carol Mayers; that blood stains found on the towel belonged to blood group type A; that hairs found on the trousers and towel bore the same characteristics as hairs of Diane Bill; and that hairs found on the trousers, towel and coat bore the same characteristics of hairs of Carol Mayers.

The vital question here is whether the affidavits provided a sufficient basis for an independent determination by a neutral magistrate that probable cause existed for the issuance of the warrant. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

As the North Dakota Supreme Court considered this question without referring to petitioner's failure to object to the admission into evidence of the

seized items this Court does not reach the effect of the lack of objection. United States ex rel. Hughs v. McMann, 405 F.2d 773 (2nd Cir. 1968).

Where no objection at all is made to the admission of the fruits of an unconstitutional search and seizure, the point is not waived unless the record shows a knowing and deliberate by-pass and forfeiture of petitioner's constitutional objections to the evidence as a matter of trial strategy. Mize v. Crouse, 399 F.2d 593 (10th Cir. 1968); Pope v. Swenson, 395 F.2d 321 (8th Cir. 1968).

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The standards necessary to establish probable cause under this amendment for the issuance of a search warrant are contained in Spinelli v. United States, 393 U.S. 410, at p. 419, 89 S.Ct. 584, at p. 590, 21 L.Ed.2d 637 (1969):

". . . only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96 [85 S.Ct. 223, 228, 13 L.Ed.2d 142] (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U.S. 300, 311 [87 S.Ct. 1056, 1062, 18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 108, [85 S.Ct. 741, 745, 13 L.Ed.2d 684] (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270-271, [80 S.Ct. 725, 735-736, 4 L.Ed.2d 697] (1960)."

A reading of the affidavits in light of these standards leads to the inescapable conclusion that there was an insufficient basis for the magistrate's finding that probable cause existed that petitioner committed the crimes or that the items sought would be found in his residence.

In addition, the affidavits upon which the warrant issued contained facts illegally obtained from Iverson during the State's Attorney's Inquiry. When these facts are deleted, any semblance of a showing disappears that probable cause existed to issue the warrant.

A suppression of the seized items will be required upon Iverson's retrial unless the State is able to establish that the issuing magistrate examined the affiants under oath and thereby secured sufficient independent information to satisfy the requirement of the Fourth Amendment or that Iverson waived the violation of his Fourth Amendment right as a matter of trial strategy.

§ 29-29-04, N.D.C.C., provides that:

"The magistrate, before issuing a search warrant, must examine on oath the complainant and any witnesses he may produce, and must take their affidavits in writing and cause them to be subscribed by the parties making them. The depositions must set forth the facts tending to establish the grounds of the application or probable cause for believing that they exist."

The issuing magistrate is not limited only to the written affidavits, but may also consider any oral testimony given under oath. Boyer v. State of Arizona, 455 F.2d 804 (9th Cir. 1972). "This procedure differs from that under Rule 41(c), Federal Rules of Criminal Procedure where the affidavit is the sole basis upon which the determination of probable cause is made." Sherrick v. Eyman, 389 F.2d 648 (9th Cir. 1968).

". . . the proper test to be applied in these situations is that quoted in Wong Sun v. United States, 371 U. S. 471, 488 [83 S.Ct. 407, 417, 9 L. Ed.2d 441], ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).' " United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967).

This result makes it unnecessary to comment on the North Dakota Supreme Court's erroneous interpretation of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in saying that it stands for the proposition that "the Fourth Amendment protects people, not places", which led that Court to conclude that:

"Iverson's privacy during the evening could not have been invaded by a search of his residence * * * because he was incarcerated at the time of the search warrant pursuant to his lawful arrest. Therefore, the authorization of a nighttime search * * * was harmless error." State v. Iverson, 187 N.W.2d p. 33.

(c) *That the mental condition of the petitioner at the time of the preliminary hearing caused him to be denied due process, consistent with Amendment XIV, Constitution of the United States.*

The North Dakota Supreme Court conceded that it was proper for the magistrate to have Iverson examined by Dr. John R. Bohrod, a psychiatrist, and Dr. John L. Wallace, a senior psychologist, but said the magistrate erred when he failed to immediately fix a time for hearing to determine Iverson's mental condition. The Court further stated, unequivocally, that the magistrate compounded his error when he proceeded to

hold a preliminary hearing while he had before him the written reports of Doctors Bohrod and Wallace[3] indicating that Iverson was not capable of understanding the nature of the charges against him or assisting in his own defense, thereby raising the inference that Iverson was was denied the assistance of counsel under the standards set out in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In *Dusky* the United States Supreme Court held that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

█ It is now the accepted decisional law that a preliminary examination is a critical stage of criminal proceedings at which a defendant must be afforded a right to counsel. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

The North Dakota Supreme Court concedes that the statutory right to counsel at a preliminary examination, provided by §§ 29–07–01 and 29–07–04, N.D.C.C., has been upgraded to a *constitutional right* to have the assistance of counsel at a critical stage of the proceedings against a defendant. Moreover, the Court specifically stated that its holding in State v. Starratt, 153 N.W.2d 311 (N.D.1967), that a preliminary hearing is *not* a critical stage was overruled by the United States Supreme Court in Coleman v. Alabama, *supra*. This latter case, *Coleman,* has been held by our Supreme Court not to be retroactive in the recent case of Adams v. Illinois, 405 U. S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202.

But the petitioner here does not rely upon *Coleman's* retroactivity or the lack of it. Simply stated, his position is that he is entitled to a lawyer at a preliminary examination, which he was, and that a lawyer is entitled to the assist-

---

3. Understandably so, after the most cursory reading of Exhibit "N", Dr. Wallace's report to the Court on Iverson, and Exhibit "O", the report of Dr. Bohrod.

ance of his client, which manifestly on the face of this record the client could not give him at that time. Dusky v. United States, *supra*.

Having said that the magistrate erred in failing to fix a time for a hearing to determine Iverson's mental condition; having said that the magistrate compounded his error when he held a preliminary hearing on Iverson, having before him the adverse reports on Iverson's mental condition heretofore alluded to; having conceded that a preliminary examination is a critical stage of criminal proceedings; having conceded that counsel at a preliminary examination has been upgraded to a constitutional right of the defendant, the North Dakota Supreme Court nevertheless holds all this to be "harmless error," relying upon Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In the setting of this case and under the circumstances here shown there is no way this Court can conclude that this was "harmless error." We are dealing with a Federal constitutionally protected right. Moreover, in *Chapman* the United States Supreme Court said also that ". . . there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . "[4] Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 827.

How may a defendant in a criminal case be of any assistance to his counsel when qualified professional experts have said he was incapable of understanding the nature of the proceedings against him and not mentally competent to assist in his own defense? Clearly he could be of no more use to his lawyer than a tailor's mannequin.

■ If the defendant in a criminal case is entitled to competent counsel, conversely, counsel is entitled to a com-

petent defendant at the time of the criminal proceeding. The North Dakota Supreme Court said:

"The reports of the local psychiatrist and psychologist do not prove that Iverson was incompetent to understand the nature of the proceedings against him or to aid in his own defense. The reports are merely evidence to be considered in light of the report from the superintendent of the State Hospital to the contrary." State v. Iverson, 187 N.W.2d 1, 36.

In the vernacular, this statement is nothing more than a judicial cop out. The reports of Dr. Bohrod and Dr. Wallace are dated December 12, 1968. The superintendent of the State Hospital at Jamestown transmitted his report on March 20, 1969, to the State District Judge in North Dakota who had ordered him examined. Thus, more than three months had elapsed since the findings of Dr. Bohrod and Dr. Wallace that Iverson was *incompetent* and the findings of the staff at Jamestown Hospital that he was *competent*. It is elementary to suggest that both reports could have been correct *at the time they were made*.

What the North Dakota Supreme Court has said is simply this: The magistrate erred, he compounded his error, and since *long after the preliminary hearing*, Iverson was ultimately found to be competent, it was all "harmless error" under § 29–28–26, N.D.C.C. That section provides:

"After hearing an appeal, the supreme court must give judgment without regard to technical errors or defects or exceptions which do not affect the substantial rights of the parties."

■ This Court is of the opinion that Iverson's substantial rights were affected by reason of his mental condition at the time of the preliminary hearing, which condition was known to the magistrate, and that by no stretch of the im-

---

4. See, e. g., Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (coerced confession); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (impartial judge).

agination can the Supreme Court dismiss the procedure followed as "harmless error." For this reason, too, Iverson's conviction cannot stand.

(d) *The petitioner was denied assistance of competent counsel for his defense, consistent with Amendment VI, Constitution of the United States.*

Concluding that the writ must issue unless Iverson is retried, as hereinafter set out, determination of the competency of trial counsel becomes unnecessary. The grave constitutional deprivations of Iverson's rights pointed out in this opinion need not be obscured by an examination of the conduct of counsel.

In many areas there was an ineptness in the handling of Iverson's case from the times[5] of his arrest throughout the trial. But it would be oversimplification indeed to say that ineptness was confined to counsel on either side, or that it was confined to counsel alone.

(e) *The opinion of the Supreme Court, State of North Dakota, is itself a prima facie and overt denial of due process as guaranteed by Amendment XIV; Constitution of the United States, in that it was an obvious attempt to determine guilt rather than the legal sufficiency of the trial.*

 It must be borne in mind that the grounds for habeas corpus are narrow and that the guilt or innocence of a petitioner is not an issue. This Court confines itself to Federal constitutional grounds in making its ultimate decision. 28 U.S.C.A. § 2254(a).

In Iverson's case the compelling of his testimony in a State's Attorney's Inquiry in direct violation of his Fifth Amendment rights; the use of compelled testimony in an affidavit for search warrant; the clear lack of probable cause for the issuance of a search warrant; the failure of the magistrate to hold a hearing on his competency prior to a preliminary examination; the cumulative effect of what the North Dakota Supreme Court has described as "harmless error"; these and other substantial infirmities pointed out herein lead this Court to no other conclusion than that the petitioner Iverson's Federal constitutional rights were violated to the point that his entire trial was infected and that for the reasons assigned Iverson could not and did not receive a fair trial under Federal standards.

The writ of habeas corpus sought by the petitioner will issue, unless within ninety (90) days from the date hereof Iverson shall have been retried by the State of North Dakota in such manner as will insure him the protection of his Federal constitutional rights as pointed out in this opinion.

With all that has been written here the Court is impelled to add this caveat to the State's prosecutors: "I beseech ye in the bowels of Christ, think it possible ye may be mistaken."[6]

Dated at Fargo, North Dakota, this 31st day of August, A.D. 1972.

5. The plural is used since it is difficult to determine from the record which was the real arrest of Iverson. The notion that a State's Attorney and his gun-carrying administrative assistant can make a "citizen's arrest" finds support in law but not in logic. This is the first instance ever called to this Court's attention where a "citizen's arrest" was accompanied by forced disrobing in a bowling alley.

6. Oliver Cromwell to the leaders of the Scotch Army on the eve of the Battle of Dunbar.