**STATE of North Dakota, Plaintiff
and Appellee,**

v.

**James LeRoy IVERSON, Defendant
and Appellant.**

Cr. No. 488.

Supreme Court of North Dakota.

Dec. 20, 1974.

Thomas B. Jelliff, State's Atty., and Robert A. Alphson, Asst. State's Atty., Grand Forks, for plaintiff and appellee.

Shaft, Shaft, McConn & Fisher, Grand Forks, for defendant and appellant.

VOGEL, Judge.

On May 2, 1969, James LeRoy Iverson was found guilty by a jury in Grand Forks County of the crime of murder in the first degree of Diane Patricia Bill and of the crime of murder in the second degree of Carol Mayers, the two cases having been consolidated for trial. He appealed to this court, which affirmed the convictions in State v. Iverson, 187 N.W.2d 1 (N.D.1971), cert. denied sub nom. Iverson v. North Dakota, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). He then petitioned for habeas corpus in the United States District Court for the District of North Dakota, and that court, without an evidentiary hearing, granted the writ of habeas corpus unless

Iverson were retried within 90 days by the State of North Dakota. Iverson v. State of North Dakota, 347 F.Supp. 251 (D.N.D. 1972). The State thereupon appealed to the United States Court of Appeals for the Eighth Circuit, which vacated the grant of the writ of habeas corpus and reversed and remanded the case, but with instructions to hold the case for 90 days pending an evidentiary hearing by the State court on the issues of the voluntariness of Iverson's statements and his competency on November 27, 1968. Iverson v. State of North Dakota, 480 F.2d 414 (CA8 1973), cert. denied 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335 (1973). It provided that if the State granted the evidentiary hearing the petition for habeas corpus should be dismissed, and it subsequently was dismissed.

The State district court for Grand Forks County held an evidentiary hearing for six days in February, 1974. On April 3, 1974, the Honorable A. C. Bakken, judge of the district court, issued his memorandum decision holding that the only reasonable interpretation of the testimony taken at the evidentiary hearing was that "the defendant was competent to understand and to communicate as of November 27, 1968, and that his statements of said date were voluntarily given, and that no coercive, psychological means were used in such a way as to prevent the statements from being a product of the accused's free and rational choice." An order to that effect was entered on April 22, 1974, and this appeal followed.

Since the facts of the crime, arrest, and conviction are set forth in the reported decisions cited above, we will not reiterate them here, except as required in order to dispose of the limited issues before us.

First of all, we note that the order of the United States Court of Appeals relates only to an evidentiary hearing by the district court, and not to an appeal to this court. However, counsel for the defendant, after the evidentiary hearing, made a motion for a new trial, based upon an allegation of newly discovered evidence, which likewise was denied by Judge Bakken. The denial was based in part upon the fact that the motion was made more than two years after final judgment and therefore came too late. The court also, however, discussed and decided the motion upon the merits. The order denying the motion for new trial also is appealed from. In order to be perfectly sure that the matter was properly before this court, the attorney for the defendant subsequently made a motion under Chapter 29–32, N.D.C.C., the Uniform Post-Conviction Procedure Act, and that motion also was denied upon the merits by Judge Bakken, and the order denying it is likewise appealed from and is properly before us. Since the issues raised in the three appeals are similar, we will consider all of the issues raised as to the evidentiary hearing, the motion for new trial, and the motion under the Uniform Post-Conviction Procedure Act.

### THE OPINION OF THE COURT OF APPEALS

We turn now to an analysis of the opinion of the Court of Appeals, in which it directed either the holding of the evidentiary hearing or the granting of the writ. The Court of Appeals held, first, that there was probable cause for the issuance of the search warrant (if Iverson was competent when he gave the information used in part to obtain the search warrant), agreeing with what this court said in State v. Iverson, 187 N.W.2d at 28.

Second, it held that the preliminary hearing of Iverson, held after Drs. Wallace and Bohrod had reported that Iverson was incompetent to aid in his defense, did not violate due process, primarily because there was no showing of prejudice. The Court pointed out that Iverson was unquestionably competent at the time of his trial, that he did not testify at the preliminary hearing, and that it was difficult to know in what manner he might have additionally aided his counsel at the preliminary hearing.

■ Third, the Court of Appeals held that it was not constitutionally required that Iverson be given the full *Miranda* warnings prior to requiring him to testify under subpoena at an early stage in the investigation. The Court points out that Iverson was not in custody, that he testified only about 20 minutes and left after his testimony was completed, that the power of the State to compel persons to testify in court and before grand juries cannot be disputed, and that to subpoena a potential defendant before a grand jury is not, per se, a violation of constitutional rights. The Court further pointed out that Iverson's statements were more in the nature of admissions than confessions, but that there is no constitutional distinction between admissions and confessions.

Fourth, the Court of Appeals was of the opinion that the State courts had not sufficiently explored the "totality of circumstances" to determine whether Iverson's statements were voluntarily and freely given, irrespective of the inapplicability of the *Miranda* rule. The Court of Appeals then listed what it considers relevant factors to be considered on the question, including the fact that Iverson was not arrested or otherwise in custody, that the statement of the State's Attorney which the defendant criticizes, and which is set forth below, was given to two other witnesses who also were subpoenaed, as Iverson was, that Iverson therefore was not singled out as the only witness to whom such remarks were made, that the interrogation of Iverson was of short duration and no restraint was used or threatened, and that no accusatory or coercive means, either physical or psychological, were used in the examination.

The statement made by the State's Attorney at the commencement of the interrogation of Iverson was as follows:

"Q. Now, this is a State's Attorney's inquiry as to the death of Carol Mayers and Diane Patricia Bill. I must advise you that you cannot refuse to answer the questions. Once the statement has been completed here and transcribed, you will be required to sign that this is your testimony. I must advise you that you have a right to have an attorney present during these questions if you so desire. What is your wish? I can tell you that the matter of the inquiry is the fact of a double murder or at least of a homicide of one nature."

To this question, Iverson answered: "Okay." The State's Attorney responded, "Okay what?" And Iverson replied, "Well, you said—proceed. The statement is all right with me." Then the State's Attorney said, "All right." And Iverson said, "I don't understand it." The questioning then proceeded. The Court of Appeals comments that the answer "I don't understand it" might, with plausibility equal to other possible interpretations, refer to the State's Attorney's preceding statement that "the matter of the inquiry is the fact of a double murder or at least of a homicide of one nature."

■ The ultimate conclusion of the Court of Appeals is that:

"The real inquiry in passing upon the voluntariness issue should be to ascertain whether coercive, psychological means were used in such a way as to prevent the statement from being a product of the accused's free and rational choice. See generally Developments in the Law, Confessions, 79 Harv.L.Rev. 938 (1966). The overall concern governing custodial interrogations resulted in the per se rule adopted in *Miranda*. However, where that atmosphere which justifiably provokes the concern is nonexistent, then the totality of the picture must be viewed and weighed to see if there is any substance to the claim that an individual's free will was overborne." Iverson v. State of North Dakota, 480 F.2d 414, 426 (CA8 1973).

■ The Court of Appeals also considered it significant that the State trial court found that the defendant was not illiterate, that he finished high school cours-

es while in prison, and that he had attended Bismarck Junior College one year. The Court mentioned that the defendant was not unfamiliar with the procedure of arrest. It noted, however, that there were additional circumstances which justified further investigation. One is the fact that a psychiatrist and a senior psychologist (Drs. Bohrod and Wallace) on December 12, 1968, found Iverson to be incompetent. The Court points out that whether he was incompetent at the time he gave the incriminating statement directly affects the issue of voluntariness, citing Blackburn v. Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); United States v. Silva, 418 F.2d 328, 330 (CA2 1969); and Green v. United States, 128 U.S.App.D.C. 408, 389 F.2d 949, 952 (1967). It notes that the brief of the petitioner shows that the defendant did not directly raise the incompetency issue in the State court as it affected the voluntariness of the November 27, 1968, statements, but directs that the issue now be considered by the State court.

 The Court of Appeals suggests that the State court obtain laymen's observations as well as medical opinions, and that investigation be made of the defendant's ability to understand and communicate with people, that his trial counsel perhaps could give meaningful insight as to defendant's ability to understand and communicate, and that "although it has not been raised, this Court would view it as fundamental error if in fact Iverson were incompetent at the time that he gave not only a statement to the State's Attorney in the afternoon of November 27, but also the subsequent statement given that evening at the police station after he had been informed of his full *Miranda* rights."

The Court of Appeals ordered the Federal District Court to grant 90 days for the State to "hold an evidentiary hearing on the question of Iverson's competency and make a determination based upon the 'totality of circumstances' as to whether Iverson's statements of November 27, 1968,

were voluntarily given." In Footnote 15 of its opinion the Court says:

"In weighing the voluntariness of Iverson's statement, the evidentiary hearing should consider anew, in addition to the issue surrounding petitioner's competency at the time in question, all circumstances then existing, including, but not limited to, other relevant facts such as what warnings were or were not given, the preliminary remarks of the state's attorney, the responses of Iverson, the surroundings, etc. As stated, the essential issue is whether the statements given were the product of the accused's free and rational choice."

## ISSUES SETTLED BY PRIOR DECISIONS

It will be seen that many of the disputes earlier involved in this case now are settled by the appellate court decisions, both State and Federal. It is settled that no *Miranda* warning was necessary prior to the first interrogation of Iverson on the afternoon of November 27, 1968, and that he was given such a warning prior to his interrogation on the evening of that day. It is settled that there was probable cause for the issuance of the search warrant which produced incriminating evidence (unless we find that Iverson was incompetent when he gave information which was used to obtain the search warrant). It is settled that the circumstances of the preliminary hearing conducted on January 21, 1969, did not violate due process, and Iverson was not prejudiced thereby. Of course, if new evidence at the evidentiary hearing should upset the basis for some of the determinations just mentioned, we should make a redetermination of them.

## ISSUES REMAINING

We now will consider the matters which are controverted at the evidentiary hearing.

 The 30 witnesses called were nearly unanimous in saying that Iverson was gen-

erally cooperative and compliant, followed directions of his employers and others in authority, and understood instructions given to him. It appears that both sides of the case offered such evidence, but for differing purposes. The State offered it to show that Iverson was legally competent and that his testimony was given understandingly and voluntarily, while the defense offered similar evidence to show that Iverson's will was easily overborne and psychological pressures upon him could readily overcome any resistance he might have to incriminate himself.

There was also some testimony that Iverson, while ordinarily agreeable, became violent at times, particularly when he had been drinking. One description of his conduct was that he was complacent unless the aggressive component of his personality was triggered.

Both sides offered psychiatric testimony. The defense offered the testimony of Dr. Wallace, a psychologist who had examined Iverson about 13 days after his arrest and determined at that time that he was unable to assist in his defense because of mental incompetency. He testified at the evidentiary hearing that in his opinion Iverson was mentally impaired, that there was a "high probability of mental impairment which affected the voluntary nature of his statement." To what degree it affected the voluntary nature of his statement was not described by Dr. Wallace.

The State offered the testimony of several medical experts including Dr. Hubert Carbone, the superintendent of the North Dakota State Hospital, who gave his opinion that Iverson was competent on the day in question, as well as being competent when he later was examined by Dr. Carbone and the staff of the State Hospital; that he was competent to stand trial, knew the nature of the act of which he was accused and the potential consequences, and was capable of contributing to his defense. Dr. Carbone gave as his diagnostic impression: "episodic excessive drinking in a basi-

cally inadequate, passive-aggressive personality structure."

There was other medical testimony, including that of a doctor who had treated Iverson several times and considered him competent; and a great deal of lay evidence, most of it indicating competence to an average degree. The trial court concluded that

". . . the testimony of all witnesses, with the exception of Dr. Wallace, discloses that the defendant was fully competent to understand the nature of the proceedings and fully competent to communicate with others when he gave his statements to the State's Attorney at approximately 4:50 p. m., and to police officers at approximately 11:20 p. m., November 27, 1968."

We agree.

The contrary testimony of Dr. Wallace was based upon an examination of approximately two hours, which Dr. Wallace admitted was not long enough. However, at the trial he had the benefit of reports of other psychiatric and psychological examinations, which he said confirmed his earlier opinion. His earlier opinion was given at the request of the county court of Grand Forks County, but was disregarded by that court, which proceeded to hold the preliminary hearing regardless of Dr. Wallace's opinion that Iverson could not at that time assist in his defense. As pointed out above, the court's proceeding with the preliminary hearing has been held not prejudicial, partly because Iverson did not testify at the preliminary hearing. The county judge, basing his opinion in part upon his own experience in conducting more than 300 mental-health hearings under State law, concluded that Iverson was competent to assist in his defense. We have examined the transcript of the questioning of Iverson by Dr. Wallace and his associates and we, based upon some experience in such matters also but without medical expertise, find nothing in Iverson's answers to indicate anything other than normal responses.

We note further that Dr. Wallace's opinion was based in large part upon an analysis of Rorschach tests, and that Dr. Ismir of the State Hospital staff also gave Rorschach tests and concluded:

"The projective tests, and in particular the Rorschach, failed to provide any peculiar, loose or bizarre concepts. None of the formulations expressed by him were extreme or suggestive of either schizophrenic or neurotic disturbance. Instead the emerging picture is that of a passive-aggressive orientation and make-up."

The Court of Appeals noted that Judge Bakken did not evaluate or discuss the fact that Drs. Wallace and Bohrod had reported to his court that Iverson was not competent to understand the nature of legal proceedings. Judge Bakken, in his memorandum opinion, makes clear that he did evaluate the opinions of Dr. Wallace and Dr. Bohrod, although he did not discuss them in his prior decision. He states:

"However, I did order that the defendant be given a mental evaluation at the state hospital prior to trial and such examination was conducted during the period from February 14 to March 21, 1969. With knowledge of the very limited and incomplete basis for the findings of Dr. Bohrod and Dr. Wallace, I accepted the findings of Dr. Carbone and his staff as correct as did the defendant and his counsel at that time."

We believe the evidence overwhelmingly indicates that Iverson was competent on November 27, 1968. We have not detailed the testimony of the other 29 witnesses, but we agree with Judge Bakken's characterization of it.

It was suggested by the Court of Appeals that the trial attorney for Iverson might cast some light upon the circumstances of November 27, 1968. The State was prevented from exploring the attorney's communications with his client by the positive refusal of Iverson to waive the attorney-client privilege. As a result, the State could only inquire as to the attorney's observations, which were generally favorable to the State's contention that Iverson was competent and cooperated with his attorney.

At the time of the trial and for some time prior to it, the trial attorney for Iverson had the assistance of two or more law students at the University of North Dakota. Two of these former law students, Kent Higgins and Richard Baer, testified. No privilege was asserted as to their testimony. It was their opinion that Iverson, while cooperative, was somewhat passive and did not volunteer information to them. They thought he was excessively unemotional. However, Mr. Higgins testified that he had no feeling that Iverson was incompetent at the time of the trial. A possible explanation for lack of cooperation between Iverson and the two law students appeared when the trial attorney, Mr. Rubin, testified that he had instructed Iverson not to talk with anyone without Rubin's knowledge and that this may have caused Iverson to hold back when conversing with the law students. Rubin testified that he had no difficulty in communicating with Iverson, who in turn had no difficulty in expressing himself to Rubin. He said that Iverson was cooperative, responded logically, and had a good rapport with the attorney. In fact, Mr. Rubin testified that Iverson acted no differently toward him than did any other client.

The evidentiary hearing provided a full exploration of all the circumstances of the two statements given by Iverson on November 27, 1968. The first statement, which is the more strongly challenged, was not a confession, but included statements which were used for impeachment at the trial. The impeachment related mainly to a discrepancy between the earlier statement [see State v. Iverson, 187 N.W.2d 1, 20] when Iverson admitted that on the day before the bodies were found he had climbed the stairs to the girls' apartment and knocked on the door, and his testimony at the trial that he had stayed in the car and honked the horn. As was pointed out

in the earlier decisions, the first statement was taken a few hours after the discovery of the bodies, at a time when the investigation was just beginning and had not jelled to the point of proceeding in any certain direction. Iverson was subpoenaed to appear at the State's Attorney's office for interrogation, but so were two residents of the apartment building where the bodies were found. The same warning was given by the State's Attorney to all three. The warning is severely challenged, and properly so, because it included the sentence "I must advise you that you cannot refuse to answer the questions" without also advising him that he had the right to remain silent and exercise his privilege against self-incrimination. However, it has already been determined by this court and the Court of Appeals that the *Miranda* warnings were not required at this stage of the proceedings where Iverson was not the focus of investigation and was not in custody. Although the interrogation took place at the police station, it lasted only about 20 minutes and Iverson left at the conclusion of the questioning and, according to at least one witness, was free to go at any time during the interrogation.

The questioning at the police station took place in an office, not a cell. The room was about 10 by 14 feet, furnished with a desk and three chairs, lighted by four fluorescent lights in the ceiling, and was carpeted and had drapes at the windows. The defendant was seated in an upholstered leather chair when he gave the statement. Other persons present, the State's Attorney and two police officers, gave testimony which was indicative of a lack of coercive influences. The court reporter, also present, testified that in his opinion the defendant understood his right to counsel and understood the proceedings and knowingly consented to the taking of the statement, but also testified that he got the impression that the answer "I don't understand it" applied to the entire statement of the State's Attorney which preceded it. However, it is equally plausible that the answer could have referred only to the portion of the statement referring to a double murder.

The defense puts much weight upon excerpts from the testimony of the court reporter, and also upon statements by one of the police officers that he considered Iverson a "suspect" at the time he was subpoenaed to make a statement in the afternoon of November 27. Weight is also placed upon the statement of the same officer that he would have detained Iverson if Iverson had attempted to leave during the afternoon interrogation. However, this testimony is based upon recollection many years later and is contradicted by equally credible testimony of other officers, Lieutenant Bye and former Detective Siverson. Similarly, defense counsel points to a discrepancy between the testimony of the chief of police to the effect that he had not ordered a bloodhound brought to the police station and the testimony of the handler of the bloodhound that she was contacted by the chief of police to do so. We believe that all of these matters represent the kinds of conflicts between the recollection of different witnesses which are often encountered in litigation and are normally resolved by the finder of fact in favor of one contention or the other. We believe that the trial court here was well within its discretion in resolving the conflicts in the evidence, and that they are not crucial to the ultimate conclusion in this case.

The defense also contends that allowing the bloodhound to enter the office where the afternoon interrogation took place was inherently coercive and that a suggestion that Iverson take a "lie detector" test likewise was coercive. We note that the presence of the bloodhound came either at the end or near the end of the afternoon interrogation, and that there is no evidence to the effect that the presence of the bloodhound or the suggestion as to the use of the "lie detector" had a coercive effect in fact. Nor do we believe that we can find a coercive effect as a matter of law.

## CONCLUSION

■ From our analysis of the transcript of the evidentiary hearing and the arguments and briefs of the parties, viewing them in the light of the prior decisions of this court and the Court of Appeals and the applicable case law, and particularly in view of matters which are authoritatively settled by prior decisions of this court and the Court of Appeals, we conclude that James LeRoy Iverson at all times pertinent to the inquiry was mentally competent, that he was of normal mentality and had some prior experience with the law, that the circumstances of his interrogation, both afternoon and evening, were not inherently coercive or prejudicial, that at all times he was rational and responsive and fully aware of the consequences of his actions and the answers to the questions propounded to him, that he at all times was able to assist in his defense and did so, and that the totality of the circumstances indicates that his statements were voluntary and he was competent on November 27, 1968, and the statements he gave were the product of his free and rational choice.

The case law cited by the Court of Appeals supports our conclusions. In Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), the Supreme Court reversed convictions prior to the *Miranda* case because confessions had been involuntarily coerced. But the circumstances were far different from those in the present case. In *Davis,* an impoverished defendant with a third- or fourth-grade education was held 16 days in a cell without outside contact until he confessed, and he had reason to believe he would be held much longer if he did not confess. He was given limited food and was interrogated daily for at least 45 minutes during his confinement. In *Haynes,* the defendant was not allowed to call his attorney or his wife for 16 hours, at which time he confessed. Such cases are not comparable to a non-custodial 20-minute interrogation.

The Court of Appeals cited several habeas corpus cases, where the original trials antedated the Supreme Court's *Miranda* and *Escobedo* cases, holding that failure to inform a witness who is a potential defendant of his right to remain silent is not inherently coercive, even under more aggravated circumstances than we have here. Procunier v. Atchley, 400 U.S. 446, 453–454, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); United States v. Yeager, 446 F.2d 1360 (CA3 1971); Michaud v. Robbins, 424 F.2d 971 (CA1 1970). In *Yeager,* a 16-year-old was interrogated for 2½ hours in the daytime without being advised of his right to remain silent, and it was held that these facts did not preclude the State court's conclusion that the confession was voluntary. Similarly, in *Michaud,* a 15-year-old boy was interrogated for 2½ hours without advice as to his right to counsel or his right to remain silent, and it was held that his confession was voluntary.

We have carefully examined the opinion of Judge Bakken, which summarizes the testimony of all of the 30 witnesses at the evidentiary hearing and the transcript. Without setting forth the opinion at length, we note our agreement with its analysis and conclusions.

■ We affirm the trial court's denial of the motion for a new trial on the ground that the motion was not timely made. We also have independently considered the motion for post-conviction relief on the merits, and conclude on the merits, for the reasons discussed in connection with the evidentiary hearing, that the defendant is not entitled to such relief.

The orders and judgments of the trial court are affirmed.

ERICKSTAD, C. J., and JOHNSON, PAULSON and KNUDSON, JJ., concur.