STATE of North Dakota,
Plaintiff-Appellee,

v.

Patrick Arthur FISCHER,
Defendant-Appellant.

Cr. No. 486.

Supreme Court of North Dakota.

April 24, 1975.

Rehearing Denied June 24, 1975.

Bjella & Jestrab, Williston, for defendant and appellant, argued by John R. Gordon, Williston.

Leroy P. Anseth, State's Atty., Williston, for plaintiff and appellee.

SAND, Judge (On Reassignment).

The appellant, Patrick Arthur Fischer, was convicted in Williams County District Court of murder in the second degree for the fatal shooting of Ruby Ramsey, on February 8, 1973, in the City of Williston. On February 22, 1974, a criminal judgment and order of commitment to the state penitentiary at Bismarck was entered by the district court, sentencing the appellant for an indeterminate term of from 27 to 30 years. It is from this judgment and order of commitment that Mr. Fischer appeals.

Two allegations of error are the bases of Mr. Fischer's appeal. They are:

1. The district court erred in refusing to order mental examination of the defendant required by § 29–20–01, N.D.C.C., and in refusing to hold a hearing to determine the competence of defendant to stand trial and assist in his own defense, and thereby denied defendant's constitutional right to due process and a fair trial.

2. The trial court erred in refusing to give Defendant's Requested Jury Instructions numbered 1 and 2.

Those requested jury instructions are:

Defendant's requested Jury Instruction No. 1.

"If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder."

Defendant's Requested Jury Instruction No. 2.

"If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."

During the course of Mr. Fischer's trial, his appointed counsel moved the court on his behalf to declare a mistrial on the basis of Mr. Fischer's incompetency to stand trial and assist in his defense. His counsel further moved the court to fix a time for a hearing to determine Mr. Fischer's competency to stand trial, pursuant to Section 29–20–01, N.D.C.C., which provides:

"If, before or during the trial, the court has reasonable ground to believe that the defendant against whom an indictment has been found or an information filed is insane or mentally defective to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court immediately shall fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing, or it may commit the defendant to the state hospital at Jamestown or the state school at Grafton for observation and examination regarding his present mental condition. The proper officer of such institution shall present to the court which conducted the hearing a report regarding the defendant's present mental condition. He also may be summoned to testify at the hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party."

One of the pertinent questions before us is whether the trial court erred in refusing to grant the motion for a hearing regarding defendant's competency to stand trial at the time.

The evidence before the trial court, in addition to oral examination by the court and the discourse between the defendant and the court, consisted primarily of affidavits of defendant's court-appointed attorneys and a report from the State Hospital

consisting of a letter from Hubert A. Carbone, M.D., with attached copies of the mental examination dated March 17, 1973, psychological evaluation dated March 29, 1973, social history dated April 13, 1973, diagnostic staff conference dated April 16, 1973, and a letter to Harry M. Pippin, co-counsel for the defendant, dated May 8, 1973, from Dr. Hubert A. Carbone.

The chronological sequence of events, for a better understanding, is as follows:

February 8, 1973—The homicide occurred.

February 14, 1973—The warrant of arrest was issued.

March 8, 1973—Court appointed counsel, Harry Pippin.

March 20, 1973—Court issued order sending defendant to the State Hospital for mental and competency evaluation.

April 16, 1973—Defendant was returned from State Hospital.

April 16, 1973—Mr. Harry Pippin received letter from Dr. Hubert A. Carbone stating his conclusions as to the mental competency of the defendant, together with the reports of the examination, psychological evaluation, social history and diagnostic staff conference. (Report concluded defendant was competent to stand trial.)

May 8, 1973—Letter to Harry M. Pippin from Dr. Carbone stating that he has no way of knowing the length of time defendant may have been in remission prior to his arrival at the Hospital.

September 19, 1973—Preliminary examination was scheduled but because counsel Pippin was hospitalized it was continued.

At about the same time two co-counsel were appointed.

October 9, 1973—The preliminary examination was held and defendant was bound over for trial to the district court.

October 16, 1973—Defendant was arraigned; but the arraignment was continued to permit the defense to prepare a motion in advance of the entry of plea. Also, defendant for the first time admitted a recollection of events occurring on February 8, 1973. (Defendant had previously stated to authorities at the State Hospital that he had no recollection of events of February 8, 1973.)

January 7, 1974—Motion to suppress certain physical evidence was made and granted.

January 16, 1974—Defendant entered plea of not guilty.

February 6, 1974—Defendant's motion in limine to limit cross-examination was heard. Motion was denied.

February 7, 1974—Pre-trial conference was had.

February 9, 1974—Defendant reiterated to Neff, his attorney, his willingness to testify.

February 11, 1974—Trial commenced. Defense counsel in opening statement stated that defendant was to testify on his behalf.

February 12, 1974—After one full day of trial the defendant, at 8:30 p. m., told his counsel he refused to testify and that this decision was final.

February 13, 1974—Defendant moved for mistrial on the ground that the defendant is incompetent to assist in his own defense and requested the court fix a time for a hearing to determine the defendant's mental condition pursuant to Section 29–20–01, N.D.C.C.

Each of the three court-appointed attorneys for the defendant, John R. Gordon, Vern C. Neff and Aldean Allen Wahl, submitted supporting affidavits on the motion for a hearing pursuant to the provisions of Section 29–20–01, N.D.C.C.

The affidavit of Neff in substance stated that he informed the defendant that the State was willing to accept a plea to manslaughter but defendant refused to plead. Defendant said he was entitled to a jury trial and would testify on his own behalf.

An opening statement was made predicated upon defendant's assurance that he would testify on his own behalf. On February 12, 1974, defendant, for the first time, informed the affiant he would not testify. Defendant told this affiant that Gordon, one of his attorneys, told the jury what happened and that is all the jury needed to know. (This apparently refers to the opening statement.)

The affiant stated that in his opinion the defendant's decision was not rationally arrived at or rationally conceived and that the defendant did not have the ability to make a decision or have a rational understanding of the situation.

Gordon, in his affidavit, in substance stated that he was appointed as defense counsel by the county court on September 24, 1973, and was also appointed as defense counsel by the district court on October 16, 1973. Affiant stated that he had examined the report from the State Hospital and decided that there was no basis for a defense of insanity.

On October 16, 1973, defense counsel secured cooperation of the defendant, who admitted recollection of the events on February 8, 1973, but the defendant refused to disclose full details until February 11, 1974, when he did so at approximately 4:30 p. m.

On January 15, 1974, defendant advised that he would not enter a plea of guilty to any charge. On January 24, 1974, defendant refused to disclose details of conversations with decedent and again refused to plead guilty to a lesser charge but insisted upon a jury trial. The defendant would not talk while a recording machine was on. Defendant agreed to testify.

Affiant, with co-counsel, interviewed defendant on numerous occasions in an effort to secure a complete disclosure of the events, but in each instance were met with definite reluctance on the part of the defendant to discuss any of the events involved in the defense and an absolute refusal to discuss matters which the defendant considered not important.

On February 7, 1974, defendant was advised of the scope of cross-examination and that it might include matters relating to his past history. On February 11, defense counsel had further discussion with the defendant at which time he advised counsel of the nature of the conversation with the decedent on February 8, 1973. Counsel advised defendant of what was intended to be covered or contained in the opening statement. The defendant advised counsel he intended to testify.

On February 12, 1974, at about 8:30 p. m., the defendant was advised that the State's Attorney would cross-examine him and explained to him the nature and form of the examination by the State's Attorney. After some more discussion with the defendant, the defendant stated he would not testify. Defendant was then advised that under the evidence presently in the record the jury would convict him of first degree murder. The defendant refused to listen.

The affiant stated that, in his opinion, the defendant does not comprehend or have the ability or capability of rationally or logically evaluating anything explained to him relating to his defense.

Aldean Allen Wahl's affidavit, in substance, stated that the defendant refused to plea bargain on January 15, 1974. The defendant, on November 5, 1973, had stated that he would not testify but changed his mind on January 24, 1974, and agreed to testify, but then again changed his mind on February 12, 1974, and decided not to testify. The defendant accused him and other counsel of lying to him and conspiring with the State's Attorney and that the witnesses were merely playing a part against him.

In our view, the defendant's changes of mind from not testifying, to testifying, and back again to not testifying on his own behalf, as stated in the affidavit of Wahl, suggests that the defendant may have been consistently reluctant or uncertain about testifying.

Relevant excerpts of the transcript relating to the oral examination of the defendant by the court, and dialogue between the court, the defendant, and the defendant's attorneys, are as follows:

"THE COURT: Well, I think he understands. He seems to understand this. I have interrogated him with some of the most incisive questions that I could devise, and he seems to respond with a complete understanding.

"THE DEFENDANT: Your Honor, I think what we have here is a lack of communication.

"Q. [By the Court] Can you explain that further to me. There is nothing that you have withheld from your attorneys?

"A. No.

"Q. Is there anything you feel they withheld from you?

"A. No.

"Q. Where is this lack of communication?

"A. Well, the whole thing comes down to whether I testify or not. I think that is the thing.

"Q. Tell me in your own words what you feel the implication would be of your—either of your testifying or your refusing to testify, whichever way you want to look at it.

"A. The only part I fear is the State's Attorney.

"Q. Well, what is your fear of him?

"A. Well, I have no idea of what questions he would ask.

"Q. You mean the fear that he would ask questions of embarrassment or what?

"A. No.

"Q. That would impeach your testimony or—

"A. No.

"Q. What kind of questions are you afraid of?

"A. I have no idea what he is going to ask."

After some further questioning and dialogue, the Court said:

"It isn't that he has a fear of incriminating himself. It is based on a reluctance to subject himself to cross examination."

"Which is a different reason. And I simply wanted to assure him that on that aspect of it that the Court will be fair to the Defendant and try to make certain that only proper questions are submitted to him, either concerning the merits of the case, or otherwise proper impeaching questions.

"I think we can make that determination in the morning. I am inclined to give him the opportunity to think this over, because it is a substantial change in trial strategy here".

Later the Court said:

"So long as he understands that that is the risk involved, it is his choice to remain silent.

"And you do understand that, Mr. Fischer?

"THE DEFENDANT: That's right. I exercise that right, the Fifth Amendment.

"THE COURT: I understand. And I think you will agree that I haven't tried to persuade you to testify.

"THE DEFENDANT: No.

"THE COURT: But I have tried as effective as I can to explain to you the consequences.

"THE DEFENDANT: I understand the consequences."

This oral examination and dialogue disclose that the defendant did not wish to testify principally because of his fear of cross-examination by the State's Attorney. The trial court concluded that the defendant seemed to understand the situation and made the decision not to testify.

The April 16th report of the State Hospital, under the heading DIAGNOSIS states that the defendant has "Schizophrenic Reaction in Remission." Under the heading *Recommendation* it is stated that "Mr. Fischer is competent to stand trial and should be returned to the court's jurisdiction at the earliest possible time."

The term "in remission" means no symptoms were found to show that the individual was schizophrenic. The diagnosis of schizophrenic reaction must, out of necessity, be based upon the "record" previously made and submitted to and reviewed by the staff at the State Hospital. It is a finding based upon a record made by some person or persons prior to the current examination. It is not made upon current observations or tests conducted by the State Hospital. In this respect, the following statement in the report bears this out:

"In view of the past history of a clear-cut documented overt psychosis, we must reach the conclusion he has been psychotic in the past and at this time is in remission."

The Hospital report does not disclose any organic disability of defendant which suggests that any prior abnormal behavior was of exogenic origin. The report states, "Psychological studies of his personality at this time do not demonstrate psychotic pathology."

The court record before us does not demonstrate or show any noticeable behavioral changes on the part of the defendant since the examination at the State Hospital. The record of the State Hospital, notably, states that "we are dealing with an evasive, guarded individual who does not admit to any of his previous difficulties unless he is confronted with them and forced to acknowledge them." Diagnosis Staff Evaluation, dated April 16, 1973, by Dr. Carbone. This personality trait was found to exist at the time the defendant was observed and examined by the hospital staff and by Dr. Carbone, who concluded that the defendant was competent to stand trial.

If defendant's reluctance to discuss personal matters did not constitute grounds for a finding of incompetence to stand trial to the experts it certainly does not constitute "reasonable ground" to the trial court for purposes of proceeding under Section 29–20–01, N.D.C.C. This leaves only defendant's changes of mind as to testifying as a basis for creating a "reasonable ground." If changing one's mind constitutes incompetency, we would have many incompetents.

We do not believe that defendant's refusal to plea bargain is irrational, nor do we believe that refusing to waive a constitutional right and not testify on one's own behalf as a defendant is irrational. Neither do we believe that it is irrational to insist upon the law taking its due course. And finally, we do not believe it is irrational on the part of the defendant to change his mind about testifying on his own behalf after hearing the opening statement of the State's Attorney and some of the principal testimony against him, especially where he knew that the trial court had refused to limit the State's Attorney's scope of cross-examination.

The defendant's actions conceivably may have been unwise, but they were not irrational.

The trial court, from the evidence submitted, did not believe that there was reasonable ground to believe that the defendant was unable to understand the proceedings against him or to assist in his own defense and, therefore, did not fix a date for a competency hearing as provided for in Section 29–20–01. Nor do we believe from examining the record that such reasonable doubt existed. In addition, the court had the opportunity to observe the demeanor of the defendant, whereas we have only the written word. However, the record of the proceedings had before the court on February 13, in which the trial court orally examined defendant in depth and at length, particularly with reference to defendant's deci-

sion not to testify, clearly discloses that the defendant understood the nature of the charge and was capable of aiding in his own defense. The record, when considered as a whole, does not require that we conclude that the trial court erred in denying the motion for an examination. The evidence submitted does not raise a reasonable doubt as to defendant's competency. See Moore v. United States, 464 F.2d 663, 666 (9th Cir. 1972).

Defendant asserts that Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), is controlling. However, an indiscriminate comparison of similarities between that case and this, without due consideration or examination of essential differentiating elements is laden with pitfalls. Keeping this in mind, it is appropriate to make some observations or comparisons of essential matter between this case and the *Robinson* case.

Fischer's mental history contained in the State Hospital's report is, in pertinent part, as follows: Fischer exhibited no indications of abnormal behavior until 1968 (at which time he was 33 years of age); that in 1968 Fischer was hospitalized at St. Michael's Hospital in Grand Forks and was at that time considered to be suffering from a schizophrenic reaction as well as depression (Fischer apparently left the hospital in Grand Forks without medical approval); and in 1972 Fischer was committed to the High Ridge Hospital in Racine, Wisconsin, and at that time he exhibited "clearcut florid psychotic symptomatology," consisting of delusions and "persecutory ideation" in which mental state he believed he was being followed, that the Mafia was after him and the FBI were probably looking for him; and that Fischer had made three attempts at suicide—twice by shotgun and once by cutting his wrists. (The information regarding the suicide attempts is found in the social worker's report based upon information received from the defendant's ex-wife, but this information was not recited in the staff diagnostic evaluation.)

In *Robinson* the uncontradicted evidence shows that when the defendant was seven or eight years old a brick dropped from a third floor and hit him on the head. Thereafter, according to the testimony of his mother, he acted a little peculiar; that, in her vernacular, the blow had knocked him "cockeyed." She further testified that he suffered headaches during his childhood and his conduct was noticeably erratic, that he appeared on occasions to be in a daze with a glare in his eyes, that at times he had a starey look and seemed to be just a "little foamy" at the mouth, and on occasion reacted violently. The evidence shows that the defendant had a history of such abnormal behavior and had been confined as a psychopathic patient. It was also undisputed that the defendant had committed acts of violence, including the killing of his infant son, and attempts at suicide. Four lay witnesses who had direct dealings or contacts with the defendant testified that he was insane. The only rebuttal to the lay testimony presented was in the form of a stipulation that if the director of the behavioral clinic of the criminal court of Cook County were called as a witness to testify he would state that in his opinion, based on his examination two or three months before trial, the defendant knew the nature of the charges against him and was able to cooperate with counsel. The case record does not disclose the nature of the examination or what information had been considered by the director of the behavioral clinic. The court in this respect observed as follows:

"However, since the stipulation did not in include a finding of sanity the prosecutor advised the court that 'we should have Dr. Haines' testimony as to his opinion whether this man is sane or insane. It is possible that the man might be insane and know the nature of the charge or be able to cooperate with his counsel. I think it should be in evidence, your Honor, that Dr. Haines' opinion is that this defendant was sane when he was examined.' However, the court told the prosecutor, 'You have enough in the record

now. I don't think you need Dr. Haines.' In his summation defense counsel emphasized 'our defense is clear . . .. It is as to the sanity of the defendant at the time of the crime and also as to the present time.' " *Robinson, supra,* 383 U.S. at 383, 86 S.Ct. at 841, 15 L.Ed.2d at 821.

Also in the *Robinson* case the prosecutor on appeal argued that the defendant had waived the defense of incompetence to stand trial, but the United States Supreme Court said:

"With this record we cannot say that Robinson [defendant] waived the defense of incompetence to stand trial."

There are two major distinctions between the *Robinson* case and the instant case. In the *Robinson* case sanity at the time of the act and sanity at the time of the trial were both in issue, which fact was recognized by the United States Supreme Court.

In the instant case, as to competency, we have a complete report wherein Mr. Fischer's past history and behavior was considered by the State Hospital. In *Robinson* we have only a proposed stipulation which does not allude to or disclose the evidence or manner in which the conclusions by the proposed expert witness (director of the behavioral clinic) were reached.

Furthermore, in the instant case we have no sanity question as to the time of the alleged act but only the question of competency to understand the nature of the proceedings and to assist counsel at trial. In the instant situation, only the case history or record purports to disclose prior unusual behavior, whereas in *Robinson* at least four witnesses testified as to abnormal behavior and expressed opinions that the defendant was insane.

The doctors at the State Hospital who conducted the examination of Mr. Fischer had all of the prior history available. They nevertheless concluded and found that the defendant was competent to stand trial. The only major development since the defendant was examined at the State Hospi-

tal is the fact that he has changed his mind about testifying. This would be the major item which could not have been considered by the experts at the Hospital. This change of mind cannot be considered as a basis for establishing reasonable grounds to the court for purposes of conducting a hearing under Section 29–20–01. The trial court was aware of the *Robinson* case and the record discloses an oral examination of Fischer by the district court which was extensive, consisting of approximately thirty pages of transcript.

This Court in State v. Iverson, 225 N.W.2d 48 (N.D.1974), in syllabus paragraph 5, said:

"Evidence regarding competency of criminal defendant may consist of lay observations as well as expert medical testimony."

The same rule would apply to the question of whether or not reasonable grounds exist so as to require a hearing under Section 29–20–01, N.D.C.C. The Judge may also rely, in part, on his own impressions, observations and conclusions. The proceedings before the trial court, on the motion for mis-trial, constituted a hearing to determine if reasonable grounds existed which required a further hearing under Section 29–20–01.

A reluctance to testify is not uncommon, hence the need for subpoena powers.

The defendant, having heard the testimony against him on the first day of trial and believing he would be subject to vigorous cross-examination, could easily be hesitant or have normal reluctance to testify.

A brief review of the testimony heard on the first day of trial and the defendant's expected testimony, as asserted by defendant's counsel in his opening statement, reveals strong indications and reasons why the defendant may have changed his mind about testifying on his own behalf.

A condensed version of the pertinent testimony produced on the first day of trial consists of the following:

Kenneth Marmon testified that on February 8, 1973, while at his mother's house, at about the noon hour, he received a telephone call from Ruby Ramsey. The phone was in good operating condition. Fischer got on the telephone with Ruby and was going to tell him about "that big woman." There was some kidding going on for a short while between the parties on the telephone. Marmon testified,

"Yes. After kidding him, he said something like damn liar, that stuff. And he blowed his stack. . . . He said [to Ruby], Damn you, I will kill you, you son of a bitch. . . . Ruby then said, 'Behave yourself; stop that.' She said [to Marmon], 'I'll see you in a little bit.' And the phone went down, hanged up."

Fischer's voice sounded angry or mad. Within fifteen minutes after he hung up the telephone his sister, who lives next door to Ruby Ramsey, came in and said that Ruby was dead—had been shot.

David Trowbridge testified that on February 8, 1973, he went to the Ruby Ramsey house at about one o'clock to do baby sitting (he had done this before). When he got to the house he knocked on the door but did not receive an answer. After knocking again, Ruby came to the door, unlocked it and pushed him out of the way. She was screaming for help. He was on the porch. Ruby pushed him away and ran through the gate out in front of the house. He saw a shotgun come through the door opening, and about the same time heard it discharge. He looked up and saw Fischer with the shotgun. Ruby fell to the sidewalk. Fischer told him to get out of there, otherwise he was going to be the next one to get it. He then took off, running. He ran past Ruby. She was still breathing and he saw that she had a hole in the left shoulder. She was lying face down. He then ran to the police station. Fischer did not appear to be injured.

Leonard Reed testified that on February 8 he and his wife, during the noon hour, were standing in front of the Kalloch shoe store. He heard a shot which came from the south and then he saw a young man running up the street towards them. He looked down the street at a home three or four hundred feet away and saw a screen door open and the barrel of a gun sticking out, with a man behind the screen door. After a little while the screen door closed and he heard another shot. Katherine Reed, the wife of Leonard Reed, was present and corroborated Reed's testimony.

Stan Lyson testified that he was a police officer of the City of Williston, and on February 8, 1973, David Trowbridge came in and reported, "Rick [Fischer] just shot Ruby." He went to the scene at about 1:13 p. m. He found Ruby; she had no pulse. He also saw a man lying just north of Ruby. The two persons were taken away by ambulance. Two small children were crying. He found two spent shotgun shells just inside the front door and one shotgun shell in the gun. All had been recently fired. The shotgun with the shell in it was found in a small hallway and doorway leading into the rear bedroom. He found pieces of a knife in several places. The handle was found in the living room, and two other parts of the knife were found underneath the gun. A small piece of the knife blade was found in Fischer's clothing at Mercy Hospital. While at Ruby's house he attempted to use the telephone but it did not work. He could hear the other person keep repeating "hello, hello," and saying, "speak up." He did speak up but the other person still said "hello." Several days later, on February 15, 1973, he examined the clothes of Fischer which were taken from him on February 8. He found a mouthpiece for a telephone which fitted into the telephone at Ruby's home.

He found blood in the dining room, on the kitchen ceiling and walls, and on the kitchen floor. He also found blood on the doorway and frame between the kitchen and living room. Also, he saw blood on the couch by the south wall of the living room. Blood trailed from the living room past the couch area. There were a few spots of

blood from the kitchen, through the living room, and through the front door. He also found blood under both bodies, Ruby and Fischer. He took several pictures with an instamatic camera. A piece (receiver) of the shotgun was found near the shotgun. Without this piece the gun is inoperative and operates only as a single shot. (The gun was a pump Remington.) One shot was fired, which hit Ruby; one shot hit the ice and ricocheted off into the right door of the car setting in front of the residence. The ice was about seventeen inches from Ruby's head. The other shot was in the kitchen. There were bb's, or buckshot, on the walls and ceiling in the kitchen. This testimony does not mean that the shots were fired in the sequence stated.

The defendant's testimony would have been as follows, as asserted by his defense counsel:

In his opening statement to the jury, defense counsel stated the defendant Fischer would testify on his own behalf and that he (defense counsel) expected Fischer to testify that on February 8, 1973, he (Fischer) had purchased a record and a loaf of bread which he intended to give to Ruby Ramsey (the victim). Fischer arrived at her house at approximately noon and was admitted to the house. Fischer and Ruby Ramsey talked and drank coffee until she made a telephone call to Kenneth Marmon. Shortly after this conversation, Ruby became angry at Fischer. She told him to get out of the house, and he simply ignored her. Fischer sat at the kitchen table with his back to the hallway and bedroom. She went into the bedroom, presumably to get dressed. Suddenly she appeared in the kitchen with a shotgun and ordered him to leave the house. Fischer reached or jumped up to take the gun away from her, and in the struggle the firearm discharged, striking Fischer in the groin and knocking him down. A knife he sometimes carried in his belt was shattered by the blast. Ruby Ramsey ran from the house. Somehow, Fischer managed to regain his feet and, probably using the shotgun as a prop, he made his way to the door. In a rage of anger and pain, Fischer fired the gun at Ruby Ramsey. Fischer went back into the house and fell against the couch in the living room. Fischer did not remember how he got out on the sidewalk, where the police found him.

By comparing the foregoing testimony of the prosecution's witnesses with the testimony expected from the defendant, as asserted by his counsel, it can be readily understood that the defendant would be concerned and that his concern was rational. The defendant could easily recognize that the jury may have difficulty accepting his version as to what happened and that he could harm his case by presenting his version and subjecting himself to cross-examination. The defendant's decision, under the circumstances, not to testify did not constitute irrational behavior nor did it constitute reasons for having a hearing under the provisions of Section 29–20–01, N.D.C.C.

■■ A presumption of competency exists which is evidenced by the provisions of Section 29–20–01. The Hospital report supports rather than detracts from the presumption. The contents of a report, rather than its age, in the absence of other factors, should be controlling.

The Supreme Court of Nebraska, in State v. Boston, 187 Neb. 388, 191 N.W.2d 452, 453 (1971), said the reasonable " 'doubt referred to is a doubt arising in the mind of the trial judge, as distinguished from uncertainty in the mind of any other person. Hence, except as otherwise provided by statute, the matter of granting an investigation rests in the discretion of the trial court. * * * ' " The factual situation in the *Boston* case was somewhat different, but the basic principle of law applies in this case.

During oral argument, appellant referred us to the case of Rand v. Swenson, 501 F.2d 394 (8th Cir. 1974), which is an appeal from the case reported in 365 F.Supp. 1294 (D.C. Mo.1973), to support defendant's position,

but we find *Rand* is readily distinguishable from the instant case and does not apply.

The United States Supreme Court, on February 19, 1975, issued its opinion in the case of James Edward Drope, Petitioner, v. State of Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103. One of the main questions before the Court was whether the defendant was competent as a matter of law to stand trial. Defendant's counsel filed a motion for a continuance in order to have the defendant examined and to receive psychiatric treatment. The motion was denied. Counsel for the defendant objected to the trial on the grounds and for the reasons that " 'the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial.' " In support of the motion, defendant's counsel submitted a report made by the doctor who had examined the defendant at counsel's request. The report, among other things, recited his past medical history which described the defendant as "markedly agitated and upset" but noted that he "appeared to be cooperative in this examination but had difficulty in participating well." The report continued by stating that the defendant "had a difficult time relating," that the defendant was "markedly circumstantial and irrelevant in his speech." The report concluded that the defendant "certainly needs the aid of a psychiatrist" and "is a very neurotic individual who is also depressed and perhaps he is depressed for most of the time." The report then made the following diagnoses:

" '(1) Sociopathic personality disorder, sexual perversion. (2) Borderline mental deficiency. (3) Chronic Anxiety reaction with depression.' "

Defendant's wife testified that defendant, with four of his acquaintances, forcibly raped her and subjected her to other bizarre abuse and indignities. The defendant in mid-trial attempted to commit suicide but the court, even with the benefit of the pyschiatric report, nevertheless concluded that defendant was competent to stand trial and continued the trial in absentia.

The United States Supreme Court did not agree with the trial court's determination that Drope was competent to stand trial, and held that the trial court failed to accord proper weight to the evidence suggesting Drope's incompetence. The Supreme Court said:

"The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts."

By applying the above three-part standard, any one of which may in some circumstances be sufficient to require a hearing, to the instant case we find:

(1) There is no evidence of Fischer's irrational behavior other than the medical history which had been considered by and upon which the medical staff of the State Hospital concluded that Fischer was competent to stand trial.

(2) There is no evidence that Fischer's demeanor at the trial was irrational or that he had a lack of understanding.

(3) There is evidence of a prior medical opinion based upon medical history and an examination of Fischer after he was charged with the crime of murder in the first degree, which concluded that Fischer was competent to stand trial.

We would further observe that the *Drope* case materially differs from the instant

case in that the *Drope* case had no medical report which concluded that the defendant was competent to stand trial as was the situation in the instant case. Drope's attempted suicide during the time the trial was going on is another distinguishing feature, as well as the diagnoses in the psychiatric report in *Drope*, as compared to the diagnoses in the psychiatric report in the instant case.

In *Drope* the Supreme Court referred to Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), as the leading case on the question of competency to stand trial. The Supreme Court's per curiam opinion in *Dusky* basically concluded that the record did not sufficiently support the court's findings of competency to stand trial. It further concluded that the test must be whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him. The per curiam opinion in Dusky v. United States, *supra*, did not set forth what was in the record, but the Court of Appeals' opinion, as reported in 271 F.2d 385 (8th Cir. 1959), contains the medical reports and records, including the diagnoses made by the examining doctors. These reports and records generally concluded that because of the defendant's mental illness he was unable to properly understand the proceedings against him and was unable to adequately assist counsel in his defense. The trial court, however, concluded that the defendant was oriented as to time and place, was able to assist counsel in his own defense and therefore was mentally competent to stand trial. The *Dusky* record in this respect substantially differs from the record in the present case before us, which record supports the conclusions of the district court.

For us to conclude that *Dusky, Robinson* and *Drope* require setting aside Fischer's conviction would necessarily require us to extend the impact of those decisions beyond what the United States Supreme Court in-tended. Repeated examinations upon request of counsel or on scanty evidence can paralyze the judicial process.

We are aware that the United States Supreme Court in *Robinson* and in *Drope* observed that provisions such as those found in Section 29–20–01, N.D.C.C., are designed to jealously guard the defendant's right to a fair trial. This was accomplished in the present case by the trial court when it heard the motion, weighed the evidence, and balanced the interests of all parties.

The trial court was justified in concluding that Fischer responded as a person having a rational mind would respond, and that a reasonable doubt as to Fischer's competency was not established.

We therefore conclude that the trial court did not err in denying a hearing as requested by the defendant under Section 29–20–01, N.D.C.C.

As to the instructions, the defendant alleges error on the grounds that the court refused to give requested instructions Nos. 1 and 2.

Section 29–21–06, N.D.C.C., provides as follows:

"When it appears that a defendant has committed a public offense and there is reasonable ground to doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only."

The question is whether or not the trial court's instructions, when viewed as a whole, adequately covered this provision of law in the instructions to the jury.

Instructions must be considered as a whole, and if when so considered they correctly advise the jury as to the law, they are sufficient although portions thereof standing alone may be insufficient or erroneous. State v. Steele, 211 N.W.2d 855 (N.D.1973). *See also* State v. Williams, 150 N.W.2d 844 (N.D.1967).

The trial court, in addition to the regular routine instructions, gave the following rel-

evant instructions to the jury as to the issues raised, of which pertinent portions are hereafter set forth:

The standard Murder in the First Degree instructions as found in NDJI 1679, including the elements of the offense.

This instruction was followed by

"DUTY OF JURY

"If you find from all the evidence in this case, beyond a reasonable doubt, that all of the foregoing material allegations of the Information viewed in the light of the law, have been proven, then it is your duty to find the defendant guilty; otherwise, it is your duty to find the defendant not guilty."

The Instruction for Murder in the First Degree was followed by NDJI 1680, which is an instruction for Murder in the Second Degree. It is a standard instruction setting forth the elements of the offense, and in this instance begins with the following statement:

"In the event you find the Defendant Not Guilty of the crime of Murder in the First Degree, then you must consider whether the Defendant is guilty of the crime of Murder in the Second Degree, an offense which is necessarily included in the offense charged. . . ."

This was followed by the Duty of Jury charge set out above.

Then came the instruction for Manslaughter in the First Degree, as set out in NDJI 1691, which contained the following opening:

"In the event you find the Defendant not guilty of the crime of Murder in the First Degree or the crime of Murder in the Second Degree, then you must consider whether the Defendant is guilty of the crime of Manslaughter in the First Degree, an offense which is necessarily included in the offense charged. . . ."

After setting out the various elements of the offense, the Duty of Jury charge was again repeated, as set out above.

The instruction as to the Forms of Verdict was as follows:

"Four forms of verdict will be submitted, one a form for finding the Defendant 'Guilty' of the crime of Murder in the First Degree as charged in the Criminal Information; another form for finding the Defendant 'Guilty' of the crime of Murder in the Second Degree, as a lesser included offense charged in the Criminal Information: another form for finding the Defendant 'Guilty' of the crime of Manslaughter in the First Degree, as a lesser included offense in the Criminal Information; and a form for finding the Defendant 'Not Guilty.' You will return only one form of verdict".

The court also gave the following instructions:

*Reasonable doubt.* "The phrase 'reasonable doubt' means just what the words imply. It is a doubt based upon reason arising from a thorough and impartial consideration of all of the evidence in the case. It is that state of mind in which you do not feel an abiding conviction amounting to a moral certainty of the truth of the charge. While you cannot convict the Defendant on mere surmise or conjecture, neither should you go outside the evidence to imagine doubt to justify acquittal. If, after careful deliberation, you are convinced to a moral certainty that the Defendant is guilty of the crime charged, then you are satisfied beyond a reasonable doubt."

*Equivocation.* "If the evidence in this case will admit of two constructions or interpretations, each of which appears to you to be reasonable, one of which points to the guilt of the Defendant and the other to his innocence, you must adopt the interpretation which will admit of the Defendant's innocence and reject that which points to his guilt.

"This rule applies only when both of two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of two possible conclusions appears to you to be reasonable and the other to be unreasonable, you must adhere to the reasonable deduction and reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to the Defendant's guilt, you must otherwise be satisfied of the Defendant's guilt beyond a reasonable doubt before you can find the Defendant guilty."

█ We conclude that the instructions as a whole are adequate and it was not error to refuse the requested instructions because the instructions requested were adequately contained in the instructions as a whole.

The judgment is affirmed.

ERICKSTAD, C. J., and PEDERSON, J., concur.

PAULSON, Judge (dissenting).

I dissent.

The record before us contains a plethora of evidence that should have raised a reasonable doubt as to Fischer's competency in the mind of the trial judge.

The psychiatric report prepared by the staff of the State Hospital at Jamestown revealed that Fischer's history of abnormal mental behavior is extensive. In 1968 Fischer was hospitalized in St. Michael's Hospital in Grand Forks and was at that time considered to be suffering from a schizophrenic reaction as well as from depression. In 1972 Fischer was committed to the High Ridge Hospital in Racine, Wisconsin, and at that time exhibited "clearcut florid psychotic symptomatology", consisting of delusions and "persecutory ideation". He believed he was being followed and that the Mafia and the FBI were probably looking for him. Fischer attempted suicide at three different times—twice by shotgun and once by cutting his wrists.

In support of their motion to hold a competency hearing, Fischer's counsel submitted affidavits to the trial judge further evidencing Fischer's incompetency to assist in his defense. Their three affidavits, considered together, asserted that Fischer had agreed to plead guilty to a charge of manslaughter and that, after negotiations were made and the opportunity presented to Fischer, he refused to so plead; that Fischer informed his counsel that he would testify on his own behalf, that defenses were formulated with the expectation that Fischer would so testify, that defense counsel in his opening statement informed the jury that Fischer would testify, and that, thereafter, Fischer refused to testify; that Fischer gave his counsel no rational basis for refusing to testify; that Fischer had accused his counsel of lying to him and of conspiring with the state's attorney and the police to convict him of murder in the first degree; and that, on the basis of these facts, Fischer's counsel concluded that Fischer was incompetent and unable to assist in his own defense.

Despite this evidence, the trial court concluded that there existed no reasonable doubt of Fischer's competency to stand trial. This conclusion was apparently based upon the trial court's questioning of Fischer, the State Hospital staff's recommendation that Fischer was competent to stand trial, or both.[1] I do not dispute the psychiatrist's recommendation, nor do I question the fact that Fischer's responses to the trial court's questions could be construed to be those of a rational man.[2] My objection is

---

1. The trial court's reliance upon its oral examination of Fischer is evidenced by the following statement made by the court at the time it denied Fischer's motion to hold a competency hearing: "Well, I think [Fischer] understands. He seems to understand

this. I have interrogated him with some of the most incisive questions that I could devise, and he seems to respond with a complete understanding."

2. It is significant to note, however, that the psychiatrist's recommendation was made

that, in making its determination that no reasonable doubt of competency existed, the trial court weighed this evidence against the contrary evidence of Fischer's mental history and the affidavits of his counsel. That this type of balancing is proscribed by the United States Constitution is made clear by a reading of the applicable federal decisions.

The United States Supreme Court has decided the precise issue that we now have before us. In Pate v. Robinson, 383 U.S. 375, 385–386, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the defendant was convicted of murdering his common-law wife and was sentenced to life imprisonment. On appeal to the Illinois Supreme Court it was urged that the defendant should have been granted a competency hearing under Illinois law, notwithstanding his counsel's failure to request such hearing. The evidence before the Illinois trial court included the uncontradicted facts that the defendant had a history of abnormal behavior, and had been confined as a psychopathic patient. It was also undisputed that the defendant, Robinson, had committed acts of violence, including the killing of his infant son, and that Robinson had also attempted suicide. In rebuttal, the State offered a stipulation that an expert witness, if called, would testify that the defendant Robinson, when examined two or three months before trial, was competent and able to assist his counsel. The trial court also questioned the defendant orally, at which time the defendant apparently appeared to be competent.

On these facts, the Illinois trial court concluded that a hearing was not required. The decision of the trial court was affirmed by the Supreme Court of Illinois, under the case name People v. Robinson, 22 Ill.2d 162, 174 N.E.2d 820 (1961). The case was then heard in the federal courts on a petition for habeas corpus.

The Supreme Court of the United States held in Pate, supra 383 U.S. at 385–386, 86 S.Ct. at 842, that, on the facts presented, a hearing was required under the United States Constitution, stating:

"We believe that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial. [Citation omitted.] Illinois jealously guards this right. Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to Ill.Rev.Stat., c. 38, § 104–2 (1963). [Citation omitted.] The Supreme Court of Illinois held that the evidence here was not sufficient to require a hearing in light of the mental alertness and understanding displayed in Robinson's 'colloquies' with the trial judge. [Citation omitted.] But this reasoning offers no justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior. While Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue. [Citation omitted.] Likewise, the stipulation of Dr. Haines' testimony was some evidence of Robinson's ability to assist in his defense. But, as the state prosecutor seemingly admitted, on the facts presented to the trial court it could not properly have been deemed dispositive on the issue of Robinson's competence."

The mandate of Pate is clear: once evidence creating a reasonable doubt as to a defendant's competency is raised, a competency hearing is required. The doubt raised may not be dissipated by resort to contrary

approximately nine months prior to trial and stated that the defendant "should be returned to the court's jurisdiction at the earliest possible time". Considering this wording together with the diagnosis "schiz-

ophrenic reaction in remission"—which, by definition, is but a temporary state—the continued validity of the recommendation at the time of trial is certainly questionable.

evidence that may offer some indication of competency.

*Pate* clearly controls our present determination. I can see no meaningful distinctions between the instant case and *Pate*. In both *Pate* and the instant case, the defendants had long histories of mental illnesses, including hospitalizations at mental institutions, and repeated attempted suicides. In both cases the defendants were found by psychiatrists to be competent to stand trial, notwithstanding the defendants' prior histories. In both cases the defendants were questioned by the trial judges and their respective "colloquies" with the judges indicated that the defendants appeared to be rational.

If there is a material distinction between *Pate* and this case, it is that, in *Pate*, counsel for the defendant never moved to conduct a competency hearing, nor otherwise directly suggested to the trial judge that Robinson was not competent to stand trial. In the instant case, Fischer's counsel not only moved to conduct a competency hearing, but also submitted affidavits wherein they related to the trial court evidence of Fischer's incompetency to stand trial, as well as examples of his lack of cooperation with counsel.

Although this circumstance is not conclusive, it is a further factor that should have raised a reasonable doubt as to Fischer's competency, and is one that makes this an even stronger case for reversal than *Pate*. The absence of this factor in *Pate* was one of the main bases for the dissent in that case.[3]

Moore v. United States, 464 F.2d 663 (9th Cir. 1972), a case not discussed by the majority, further illuminates the issue before us. In *Moore,* the defendant pleaded guilty to a violation of 18 U.S.C. § 2113(a) [bank robbery]. He later sought federal collateral relief, alleging that he was incompetent at the time he entered his guilty plea.

The issue before the Circuit Court of Appeals was whether the record before it revealed facts that compelled a *Pate* hearing. The record showed that Moore was examined by a psychiatrist shortly before his arraignment and was found to be competent to stand trial. The recommendation to proceed with trial was made even though Moore manifested abnormal mental trends at the time of examination.[4] A Federal Bureau of Prisons report was also in evidence, relating Moore's history of mental illness. No other testimony was introduced at the time of arraignment.

On these facts, the Circuit Court of Appeals in *Moore* held that a competency hearing should have been held, and that the failure to hold a hearing deprived Moore of due process of law. The Court cited *Pate* as authority for its holding, and it is the Court's interpretation of *Pate* that is pertinent to this case. In *Moore, supra* 464 F.2d at 666, that Court stated:

"Under the rule of Pate v. Robinson (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, a due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. 'Substantial evidence' is a term of art. 'Evidence' encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is 'sub-

---

**3.** As stated in *Pate, supra* 383 U.S. at 391, 86 S.Ct. at 845 (Harlan, J., dissenting):

"The conclusive factor is that Robinson's own lawyers, the two men who apparently had the closest contact with the defendant during the proceedings, never suggested he was incompetent to stand trial and never moved to have him examined on incompetency grounds during trial . . . .."

**4.** Although *Moore* may be distinguished from the present case on this ground—as Fischer was in a state of "remission" at the time he was examined—this distinction does not detract from the Circuit Court of Appeals' interpretation of *Pate*, which is what is relevant in the instant case.

stantial' if it raises a reasonable doubt about the defendant's competency to stand trial. Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying *Pate's* substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? It [*sic*] sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue. It is only after the evidentiary hearing, applying the usual rules appropriate to trial, that the court decides the issue of competency of the defendant to stand trial."

*Moore* makes it clear, if *Pate* did not, that the finding of a "reasonable doubt" as to competency is not to be made by balancing conflicting evidence. If the right to a competency hearing is to be more than a paper right, trial judges must not decide the ultimate issue of competency until after a hearing has, been afforded the defendant.

In Rand v. Swenson, 501 F.2d 394 (8th Cir. 1974), the defendant was convicted in a Missouri state court of second degree murder. After exhausting his state remedies, Rand brought an action in federal district court under 28 U.S.C. § 2254, alleging, among other things, that he was improperly denied a psychiatric examination or hearing on the question of his competency to stand trial. The United States District Court granted relief,[5] and, on appeal to the Eighth Circuit Court of Appeals, the basic issue was "whether there was sufficient evidence before the state court trial judge to raise a 'bona fide doubt' as to Rand's competency to stand trial". *Rand, supra* 501 F.2d at 395.

The evidence before the state trial court consisted solely of affidavits of Rand's counsel wherein counsel related that, from their examination of hospital records, counsel had discovered that the defendant had been previously diagnosed as having mental problems, and he had previously attempted suicide. The affidavits of Rand's counsel further stated that, in counsel's opinion, formed from their own observations of Rand, Rand lacked the capacity to assist in his own defense.

The record revealed in *Rand* that the trial judge overruled the motion for a competency hearing on the basis of his own observations of the defendant during the trial. In rejecting this as a permissible basis for denial of the motion for a competency hearing, the Court of Appeals stated, in *Rand, supra* 501 F.2d at 395:

"The state contends that the trial judge is entitled to place heavy reliance on his own observations of the defendant during the trial in order to determine if there is a 'bona fide doubt' as to the defendant's competency to stand trial. However, as Judge Meredith noted and as the parties agree, the critical question is not whether Rand was competent to stand trial, but whether there was sufficient doubt raised as to Rand's competency that the state trial court should have ordered a psychiatric examination and held a hearing. As the Supreme Court noted in Pate v. Robinson, *supra* [383 U.S.] at 386, 86 S.Ct. at 842, 'While [a defendant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue.' "

I recognize from a reading of *Pate, Moore,* and *Rand,* among others, that no test has yet been devised which, once applied to the facts of a particular case, will yield a precise determination of the issue now before us. As stated in Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103, 1975, wherein *Pate* was clarified and reaffirmed:

5. Rand v. Swenson, 365 F.Supp. 1294 (E.D. Mo. 1973).

"There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated."

Yet we do know that certain factors are deemed relevant, and *Pate* has prescribed the method by which these factors are to be analyzed. Quoting again from *Drope, supra,* 420 U.S. at 180, 95 S.Ct. at 908, the United States Supreme Court stated:

"The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient."

Another factor that should definitely be considered is a lawyer's representations concerning the competence of his client. *Drope, supra,* 420 U.S. at 177–178, 95 S.Ct. at 906–907, n. 13.

In the present case, we do not have one factor "standing alone". Rather, we have many indicia of Fischer's inability to aid in his defense. Fischer has a long history of severe mental problems, including institutionalizations, diagnoses of psychosis, and attempted suicides. Fischer evinced a marked lack of cooperation with his counsel and, in fact, accused his counsel of conspiring against him. His counsel made repeated representations to the trial court that, in their opinion, Fischer was not competent to aid in his defense.

Whatever the perimeter of "reasonable doubt" of competency may be, the above factors surely place this case within those outer limits. Fischer's colloquies with the trial judge and the psychiatrist's report, although relevant, may not be held to dissipate this doubt.

I would vacate the conviction and remand for a new trial, provided, of course, that at a proper hearing Fischer is first found to be competent to assist in his defense.

VOGEL, J., concurs.